# Illinois Official Reports

## Appellate Court

> ### *L.D.S., LLC v. Southern Cross Food, Ltd.*, 2017 IL App (1st) 163058

| | |
|---|---|
| Appellate Court Caption | L.D.S., LLC, an Illinois Limited Liability Company, Plaintiff-Appellant, v. SOUTHERN CROSS FOOD, LTD., and BRENDAN SKEHAN, Defendants (Brendan Skehan, Defendant-Appellee). |
| District & No. | First District, Fourth Division<br>Docket No. 1-16-3058 |
| Filed | December 21, 2017 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 08-L-8363; the Hon. Brigid Mary McGrath, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | Robert S. Schwartz, of Robinson & Schwartz, LLC, of Chicago, for appellant.<br><br>Patrick J. Ruberry, of Litchfield Cavo, LLP, of Chicago, for appellee. |
| Panel | JUSTICE GORDON delivered the judgment of the court, with opinion.<br>Presiding Justice Burke and Justice McBride concurred in the judgment and opinion. |

**OPINION**

¶ 1 The instant appeal concerns the validity of a personal guaranty purportedly executed by defendant Brendan Skehan in connection with the lease of commercial property between plaintiff L.D.S., LLC, and defendant Southern Cross Food, Ltd. (Southern Cross). This case came before us previously, after the trial court granted Skehan's motion to dismiss, and we reversed and remanded. *L.D.S., LLC v. Southern Cross Food, Ltd.*, 2011 IL App (1st) 102379, ¶ 1. After remand, the matter proceeded to a bench trial, where plaintiff presented the testimony of one witness, plaintiff's principal. After plaintiff had rested its case in chief, Skehan moved for a directed finding, which the trial court granted. Plaintiff appeals and we affirm.

¶ 2                                    BACKGROUND

¶ 3 As noted, this case has previously been before this court, after the trial court granted Skehan's motion to dismiss plaintiff's verified second amended complaint. Consequently, our recitation of the facts up to that point is primarily taken from our prior opinion.

¶ 4 On July 30, 2008, plaintiff filed a verified complaint against defendants, alleging that defendants had breached their obligations under a lease agreement. The complaint alleged that on July 20, 2006, plaintiff, as landlord, and Southern Cross, as tenant, executed a lease dated March 31, 2006, for a property located at 117 South Clinton Street in Chicago, which was to be used as a Quizno's restaurant; Skehan signed the lease as president of Southern Cross. The lease agreement's provision concerning a security deposit provided, in relevant part:

"Concurrently with Tenant's execution of this Lease, Tenant shall deposit with Landlord the Security Deposit."

¶ 5 According to documents attached to the complaint, on July 21, 2006, Southern Cross took possession of the property and the keys, and on July 24, 2006, Southern Cross tendered plaintiff its security deposit. The receipt for the possession of the property provided:

"On July 21, 2006 the keys and the possession of the store #117 South Clinton, Chicago has been given to the tenant Mr. Brendon [*sic*] Skehan.

It is mutually agreed that the landlord shall also complete his work (installation of HVAC unit and dividing wall) that is required as per lease agreement during the period tenant will perform his work as required by Quizno."

¶ 6 According to the complaint, on July 26, 2006, Skehan executed a personal guaranty of the lease. The purported guaranty was attached to the complaint and was entitled, "Rider Attached to the Lease Dated 03-31-2006 By & Between L.D.S. LLC Limited Liability Company and Southern Cross Food, Ltd an Illinois Corporation ('Tenant')." The guaranty provided:

"It is hereby agreed as follows:

The tenant, Mr. Brendon [*sic*] Skehan has signed the lease agreement in [*sic*] behalf of Southern Cross Food, Ltd an Illinois Corporation, ('Tenant'). Upon signing below Brendon [*sic*] Skehan as principal of the corporation 'Southern Cross Food, Ltd corporation' hereby personally guarantees the payments of rent and all others [*sic*] performance or obligations of the tenant."

¶ 7 According to a document attached to the complaint, during the lease term, Southern Cross failed to pay rent, leaving an outstanding balance in 2007 and entirely ceasing to pay rent

beginning in March 2008. On July 14, 2008, L.D.S. relet the premises to a Dunkin Donuts restaurant, which began paying rent in November 2008.

¶ 8    On December 22, 2008, Skehan[1] filed a motion to dismiss pursuant to section 2-615 of the Code of Civil Procedure (Code) (735 ILCS 5/2-615 (West 2006)). In the motion, Skehan claimed that the verified complaint did not allege any new consideration for Skehan's personal guaranty of the lease, which was required since the guaranty was executed after the lease became effective.

¶ 9    Plaintiff did not respond to Skehan's motion to dismiss but, instead, on February 9, 2009, filed a verified amended complaint. Count I of the verified amended complaint was substantially identical to the allegations in the verified complaint. An additional count II included several new allegations, which alleged that the consideration for the guaranty was plaintiff's permission to place interior signage on the premises.

¶ 10    On March 31, 2009, Skehan filed a motion to dismiss count II of plaintiff's verified amended complaint pursuant to section 2-615 of the Code. Once again, Skehan claimed that the verified amended complaint did not allege new consideration for the guaranty. He claimed that the purported consideration was plaintiff's granting of permission to install interior signage pursuant to an alleged agreement on July 24, 2006, but claimed that could not be new consideration for the guaranty since installation of the signage was already permitted under the original terms of the lease. On August 14, 2009, the trial court granted Skehan's motion to dismiss without prejudice and granted plaintiff leave to file a second amended complaint.

¶ 11    On September 11, 2009, plaintiff filed a verified second amended complaint. Count I concerned the breach of the lease agreement and was substantially identical to the earlier complaints. Count II concerned the breach of guaranty and included several new allegations:

"10. Contemporaneously with the signing of the Lease, on July 26, 2006, Skehan executed a personal guaranty ('Guaranty'). *** The Lease and Guaranty were part of a single lease transaction in which Southern Cross procured a Lease for the Premises and Skehan guarantied Southern Cross's obligation under the Lease.

11. This single transaction took place over the course of several days. On or about July 21, 2006, Skehan signed a Receipt for the keys to the Premises. The Security Deposit was dated July 24, 2006, and was delivered to Plaintiff thereafter with a copy of the executed Lease. *** Plaintiff refused to accept the Security Deposit until Skehan executed the Guaranty on July 26, 2006. Plaintiff never intended to enter into the Lease without the Guaranty."

¶ 12    On October 13, 2009, Skehan filed a motion to dismiss count II of the verified second amended complaint pursuant to section 2-615 of the Code. Skehan claimed that the verified second amended complaint failed to cure the pleading defect in the verified amended complaint and that no cure was possible. On March 3, 2010, the trial court granted Skehan's motion to dismiss and dismissed the verified second amended complaint with prejudice. Plaintiff appealed, and we reversed the trial court's dismissal of the verified second amended complaint. *L.D.S., LLC v. Southern Cross Food, Ltd.*, 2011 IL App (1st) 102379, ¶ 1.

---

[1]Southern Cross never filed an appearance and, on February 24, 2009, the trial court entered a default judgment against Southern Cross in the amount of $94,361.30, plus attorney fees of $2,756.25 and costs. However, during his opening statement, plaintiff's counsel indicated that Southern Cross had become insolvent.

¶ 13     After remand, on December 4, 2012, Skehan filed an answer and affirmative defense to the verified second amended complaint, in which he denied the allegations of the complaint and alleged that the signature on the guaranty purporting to be his was a forgery.

¶ 14     On May 13, 2015, plaintiff filed a motion for leave to file a third amended complaint, which was denied without prejudice "due to [the] age of [the] case." On March 31, 2016, Skehan filed a motion for summary judgment, which was denied on September 2, 2016.

¶ 15     On October 17, 2016, the case came before the trial court for trial. Plaintiff's sole witness was Subhash Saluja, plaintiff's principal, who testified that since 1990, he had owned, managed, or controlled approximately 25 leased units of commercial property. Saluja testified that plaintiff had purchased 113 to 117 South Clinton, which was being operated as a food court, at the end of 1989 and separated the property into five separate units. The unit at issue was one of those units. Saluja testified that he required personal guarantees from some, but not all, of his tenants; as an example of a tenant who did not require a guaranty, Saluja testified that "I had a tenant, Panda Express. They have 1500 restaurants. I leased them my premises, 113 South Clinton, and I never made a demand" for a personal guaranty.

¶ 16     Saluja testified that the unit at issue, 117 South Clinton, had been vacant while he was searching for a tenant. Saluja retained a real estate broker, who proposed tenants to him. Saluja rejected one proposed tenant—a doctor or dentist—because the proposed tenant refused to sign a personal guaranty. Saluja rejected another proposed tenant because "[t]hey had no assets." In February or March 2006, the broker proposed Southern Cross as a prospective tenant. Saluja testified:

> "He called me that Quizno's wants to come there. And I know Quizno's is a good franchise. In those days, it was a better market. So I said okay. And initially, I did not know [whether] I am renting to Quizno's franchisor or I am renting to franchisee. Initially, when Todd told me Quizno's, I said okay. And if Quizno's was to be signing for franchisor, I would never say guarantee because Quizno's has maybe 100 or 500 restaurants. So it would be stupid of me to tell them [to] become personal guarantor."

Saluja testified that he did not meet anyone prior to signing the lease on July 20, 2006.

¶ 17     Saluja testified that he spoke to his attorney, who drafted a lease agreement, and then the attorneys "[were] talking to each other." Saluja testified that "I was under this impression that my attorney is talking to the Quizno's attorney, although Quizno's was not my tenant, but franchisor's, but I was thinking that Quizno's attorney there was talking to my attorney for the franchisee." When asked what he meant by "Quizno's attorney," Saluja testified that he believed that his attorney was talking to the attorney for the franchisor—Quizno's—who was negotiating the lease on behalf of the franchisee—Southern Cross. Saluja "ha[d] no idea" what led him to have that impression.

¶ 18     Saluja testified that he signed the lease on July 20, 2006, and identified the lease agreement as the same one attached to the complaint; the lease was admitted into evidence. Saluja read aloud a provision of the lease's definition section, which provided "QF: Quizno's Franchising LLC or Quizno's Franchising II LLC," and read aloud another provision setting the tenant's mailing address as an address on June Lane in Lombard, "Attn: Brendan Skehan."

¶ 19     Saluja testified that after he signed the lease, it was faxed to his attorney, and his attorney received a copy signed by Skehan; it was close to one week before Saluja received a copy with Skehan's signature. Saluja received the copy and "when I [saw] the lease on the top written

there, 'Quizno's,' and then I [saw] over there written their name, tenant building address, then I said, 'Wait a minute. This is—what is going on? I am not renting to Brendan, and I don't see over there the name franchisor.' So then I said, 'Wait a minute. I have to have the personal guarantee.' "

¶ 20 Saluja testified that "Brendan met me at the premises on [the] 21st, next day, and I told him that first of all I do not have the lease agreement complete. Normally he has signed it, but I have not received. And secondly, that I told him that this is incomplete. I've got to have a personal guarantee, otherwise we are not in business. We cannot give you the business."[2] Skehan did not raise any concerns about signing a guaranty.

¶ 21 Saluja identified a copy of the guaranty and testified that it was not the original, which he had given to Skehan; the copy of the guaranty was admitted into evidence. He told Skehan to have the guaranty "approved from the Quizno's, *** then I will accept from you the rent check or security deposit." Saluja identified his signature on the bottom of the guaranty and testified that he signed it July 26; Saluja also identified Skehan's signature and testified that Skehan signed it in front of him on the morning of July 26. Saluja accepted a check from Skehan at the leased premises on July 28. Saluja testified that he drafted the guaranty based on a version that he had used with other tenants that was stored on his computer.

¶ 22 On cross-examination, Saluja testified that he had not asked his attorney to insert a guaranty into the lease agreement. Saluja further testified that, up to the point where he signed the lease, he was unaware that he was leasing the property to Southern Cross as opposed to Quizno's. He was not involved in drafting the lease, leaving it to the attorneys to communicate with each other and only waiting for the final draft to review. Saluja was again presented with a copy of the lease agreement and testified that it was an "incomplete" copy of the lease because it did not include the personal guaranty. However, Saluja admitted that he signed the "incomplete" lease agreement and further admitted that the term "personal guaranty" did not appear anywhere in the lease, either expressly or by reference.

¶ 23 On cross-examination, Skehan's counsel also asked Saluja follow-up questions based on testimony he had given on direct, in which he testified as to a wall that was constructed in the unit and changes to the HVAC system:

"Q. All right. Yesterday you told us that in exchange for this guaranty that Mr. Skehan allegedly provided, you agreed to build a wall. Do you remember that testimony?

A. Not only [a] wall. There was other things, too.

Q. You agreed to build a demising wall; isn't that true, sir?

A. As per this one, yes.

Q. Sir, that obligation existed, and that's part of the lease that you signed on July 20th; true?

A. Yes.

Q. That obligation was in no way contingent on Mr. Skehan signing a personal guaranty; isn't that true? Isn't that true, sir?

---

[2]We note that earlier, Saluja testified that he decided he needed a guaranty upon receiving the countersigned copy of the lease, which occurred approximately a week after he signed the lease on July 20. However, here, he testifies that he raised the issue of the guaranty with Skehan on July 21.

A. That had nothing to do with [the] demising wall. That is [a] different document I have on the table.

Q. So in other words then, your alleged willingness and agreement to build a demising wall was not something you gave to Mr. Skehan in exchange for his allegedly providing you with a putative guaranty; is that correct?

A. No. Sir, guaranty has nothing to do with a wall, with a Lease Agreement or what security [deposit] I am getting, what rent I am getting, how many years he is getting.

Guaranty, or go home. You give me, I signed this document, and I also tell him you have a guaranty. Okay. I signed it. I accepted it.

Rent he wanted to give me. I said no unless all documents are completed, and I did not accept a single penny from him until all lease documents are signed and those were approved by me on the table, and by his attorney."

Saluja testified similarly concerning the HVAC system:

"Q. Now, Mr. Saluja, you told us yesterday that in exchange for installing HVAC components on the property, Mr. Skehan agreed to personally guaranty the lease. Do you remember that testimony?

A. No, it is not. Personal guaranty has to be there.

Q. So in other words, installing the HVAC equipment, that was not consideration that you have in exchange for the alleged guaranty; isn't that true?

A. HVAC was already there in the building when I gave him the premises.

                       \* \* \*

He want[ed] additional. Yes, I give him.

Q. Sir, the fact is that HVAC equipment was something you were required to install per the terms of the Lease Agreement that you signed on July 20, 2006; isn't that correct?

A. Yes."

¶ 24 Later, Saluja testified:

"Q. Well, what did you give Mr. Skehan in exchange for this guaranty?

A. Exchange? I give him the premises. I give him the property, rent the business."

¶ 25 On redirect, Saluja was asked whether he informed Skehan that he would withhold possession of the premises if a guaranty was not signed, and Saluja testified:

"Yeah I gave him the keys on [July 21], I told him that I have the Lease Agreement, but I didn't see your name on the top of the lease, and I have to have a personal guaranty from you before this lease is fully completed, and I also told him if I tell my attorney to draft the agreement, this guaranty agreement, he will take again six weeks, because he took three months drafting the lease. So why don't you come in my home, we can draft ourself [*sic*].

He said okay. On [the] 26th, he came, I gave him, he looked at that, he signed it, and I got the copy, and I gave him [the] original.

I told him now go to your attorney, get it approved, because your attorney is involved in this transaction.

If attorney approves, then I cash the check. Otherwise, I am sorry.

- 6 -

Then I called him the next day or third day, and he said, yes, I did talk to my attorney, it is okay, and then so I said okay."

Saluja further testified that July 21 was the first time he informed Skehan that he required a personal guaranty.

¶ 26    After Saluja's testimony, plaintiff rested its case in chief, and Skehan filed a motion for a directed finding.[3] Skehan's counsel argued that plaintiff had failed to establish the *prima facie* elements of the case because there was no meeting of the minds and "[f]undamentally, [plaintiff] thought it was dealing with someone entirely different from Southern Cross. So [plaintiff] thought it didn't need a guaranty. That's the testimony." Skehan's counsel further argued that once Saluja determined that he required a guaranty, there was a separate transaction between Skehan and Saluja that required new consideration, and there was no such consideration. In response, plaintiff's counsel argued that Saluja did not execute the lease agreement until he accepted the security deposit, which was done after Skehan had signed the guaranty, demonstrating that there was only one transaction.

¶ 27    The trial court granted Skehan's motion for a directed finding, finding that Saluja was "an excellent witness," but that "under his testimony, his testimony alone, it reflects there were separate negotiations regarding the personal guaranty." The court found that Saluja believed that he was dealing with Quizno's and that "[i]t is his practice when dealing with a large company like that, he explained it doesn't make any sense to have a personal guaranty because it is a large company with sufficient assets. He doesn't need it. If it was a franchisee such as Mr. Skehan's company, Southern Cross Foods, he said 'I would have required a personal guaranty.'" The court further found:

"As he testified, once he found out who the tenant was, one of the terms of the lease then would be a guaranty, but it was not written in the lease.

But once he found out—so the lease is signed 7/20/2006. On 7/21, he says 'I need a personal guaranty.'

But on that same date, he gives the tenant possession.

The receipt, which he prepared, states 'On July 21, 2006, the keys and the possession of the store has been given to the tenant, Mr. Brendan Skehan. As initially agreed, the landlord shall also complete his work, installation of the HVAC unit. As required per the lease agreement, during the period tenant will perform his work as required.'

So as of that date, the keys have been tendered. Possession had been provided. The tenant had provided a security deposit.

Paragraph 5 of [the] lease states 'Concurrently with tenant's execution of this lease, tenant shall deposit with the landlord the security deposit,' and they did. He provided the check.

At the point Mr. Saluja said 'No. I want a personal guaranty now. I'm not going to cash it.'

At that point the terms of the lease, which had been signed, executed had been complied with.

---

[3]The trial transcript indicates that Skehan filed a written motion for directed finding, but the written motion is not contained in the record on appeal.

The subsequently a personal guaranty was executed on July 26th.

But that was pursuant to a separate negotiation. That was not the same negotiations as undertaken in entering into a new lease."

¶ 28   The court noted that, throughout his testimony, Saluja had been clear that he had given Skehan possession of the premises in exchange for the guaranty but found that, "looking at the evidence in whatever light, the receipt is clear. The keys and possession of the store had been given to the tenant. Now he wrote down the wrong name,[4] but he is the one who prepared this agreement. And I find that doesn't affect the validity of the fact that possession of the premises was given to the tenant on July 21, 2006." The court found:

"He admitted he signed the lease. He was discussing—let's see.

He made it clear. He said 'I was just going to back out of this lease if he didn't give a personal guaranty.'

But he already entered into the lease. The lease was already executed prior to the personal guaranty being provided to him.

So after the lease was executed in every sense of the word, he tried to put in a new provision, and he negotiated for one. But the problem is that there was not sufficient consideration for that provision."

¶ 29   The trial court rejected plaintiff's argument that by refusing to accept the tendered security deposit, plaintiff delayed the execution of the lease agreement until after the personal guaranty was signed. The court found that " 'The tenant shall deposit with landlord.' So that was the obligation. The tenant to deposit. The fact that the landlord decided not to cash it, to reject it, that doesn't affect the consideration of the lease." Accordingly, the court found that "I don't think plaintiff in their case-in-chief has met a prima facie case because they have not provided sufficient evidence regarding consideration."

¶ 30   On October 19, 2016, the trial court entered a written order granting Skehan's motion for a directed finding "in its entirety" and entered judgment in favor of Skehan and against plaintiff. This appeal follows.

¶ 31                                                    ANALYSIS

¶ 32   On appeal, plaintiff argues that the trial court erred in granting Skehan's motion for a directed finding because the evidence established that the guaranty was executed contemporaneously with the lease and therefore did not require additional consideration. As an initial matter, Skehan argues that plaintiff's brief should be stricken and its arguments forfeited due to inadequacies in the statement of facts and analysis sections of plaintiff's appellate brief. Illinois Supreme Court Rule 341(h) (eff. Jan. 1, 2016) provides the requirements for an appellant's opening brief. Rule 341(h)(6) provides that the statement of facts "shall contain the facts necessary to an understanding of the case, stated accurately and fairly without argument or comment, and with appropriate reference to the pages of the record on appeal." Ill. S. Ct. R. 341(h)(6) (eff. Jan. 1, 2016). Rule 341(h)(7) provides that the argument section "shall contain

---

[4]While the trial court did not elaborate on this point, the receipt provides that possession of the premises "has been given to the tenant Mr. Brendon Skehan." It is presumably the reference to Skehan as the tenant, as opposed to Southern Cross, that the trial court is referring to when noting that Saluja "wrote down the wrong name."

the contentions of the appellant and the reasons therefor, with citation of the authorities and the pages of the record relied on." Ill. S. Ct. R. 341(h)(7) (eff. Jan. 1, 2016). Under Rule 341(h)(7), "[p]oints not argued are waived and shall not be raised in the reply brief, in oral argument, or on petition for rehearing." Ill. S. Ct. R. 341(h)(7) (eff. Jan. 1, 2016). Supreme court rules are not advisory suggestions, but rules to be followed. *In re Marriage of Hluska*, 2011 IL App (1st) 092636, ¶ 57; *In re Estate of Michalak*, 404 Ill. App. 3d 75, 99 (2010). "Where an appellant's brief fails to comply with supreme court rules, this court has the inherent authority to dismiss the appeal." *Epstein v. Galuska*, 362 Ill. App. 3d 36, 42 (2005) (citing *In re Marriage of Gallagher*, 256 Ill. App. 3d 439, 442 (1993)). "While this court is not bound to enforce strict, technical compliance with the rules where, despite minor inadequacies in an appellate brief, the basis for an appeal is fairly clear [citation], a party's failure to comply with basic rules is grounds for disregarding his or her arguments on appeal [citation]." *Epstein*, 362 Ill. App. 3d at 42. In the case at bar, we agree with Skehan that plaintiff's statement of facts is deficient, as it devotes one sentence to explaining everything that occurred at trial, and that sentence discusses plaintiff's counsel's opening statement. However, given the thorough statement of facts contained in Skehan's brief and the fact that the trial testimony consisted of a single witness, we are able to adequately understand the issues on appeal and decline to strike plaintiff's brief under the factual circumstances of this case.

¶ 33    Turning to the merits, in the case at bar, we are asked to review the trial court's grant of a motion for a directed finding. In a nonjury case, the defendant may, at the close of the plaintiff's case-in-chief, make a motion for a finding in his favor, known as a directed finding. 735 ILCS 5/2-1110 (West 2014). In ruling on this motion, the trial court is required to engage in a two-part analysis. *People ex rel. Sherman v. Cryns*, 203 Ill. 2d 264, 275 (2003). First, the court must determine whether, as a matter of law, the plaintiff has presented a *prima facie* case. *Sherman*, 203 Ill. 2d at 275. "A plaintiff establishes a *prima facie* case by proffering at least 'some evidence on every element essential to [the plaintiff's underlying] cause of action.' " *Sherman*, 203 Ill. 2d at 275 (quoting *Kokinis v. Kotrich*, 81 Ill. 2d 151, 154 (1980)). "If the plaintiff has failed to meet this burden, the court should grant the motion and enter judgment in the defendant's favor." *Sherman*, 203 Ill. 2d at 275. Since this determination is a question of law, the trial court's ruling is reviewed *de novo*. *Sherman*, 203 Ill. 2d at 275. *De novo* consideration means we perform the same analysis that a trial judge would perform. *People v. McDonald*, 2016 IL 118882, ¶ 32.

¶ 34    If the trial court determines that the plaintiff has presented a *prima facie* case, the court moves to the second prong of its analysis. *Sherman*, 203 Ill. 2d at 275. "In its role as the finder of fact, the court must consider the totality of the evidence presented, including any evidence which is favorable to the defendant." *Sherman*, 203 Ill. 2d at 275-76. Importantly, in contrast to the standard to be employed when ruling on a motion for directed verdict in a jury trial, in ruling on a motion for directed finding, "the court is not to view the evidence in the light most favorable to the plaintiff. [Citation.] Rather, the circuit court must weigh all the evidence, determine the credibility of the witnesses, and draw reasonable inferences therefrom." *Sherman*, 203 Ill. 2d at 276. See 735 ILCS 5/2-1110 (West 2014) ("In ruling on the motion the court shall weigh the evidence, considering the credibility of the witnesses and the weight and quality of the evidence."). "This weighing process may result in the negation of some of the evidence presented by the plaintiff." *Sherman*, 203 Ill. 2d at 276. "After weighing the quality of all of the evidence, both that presented by the plaintiff and that presented by the defendant,

the court should determine, applying the standard of proof required for the underlying cause, whether sufficient evidence remains to establish the plaintiff's *prima facie* case. If the circuit court finds that sufficient evidence has been presented to establish the plaintiff's *prima facie* case, the court should deny the defendant's motion and proceed with the trial. [Citation.] If, however, the court determines that the evidence warrants a finding in favor of the defendant, it should grant the defendant's motion and enter a judgment dismissing the action." *Sherman*, 203 Ill. 2d at 276. A reviewing court will not reverse the trial court's ruling on appeal unless it is contrary to the manifest weight of the evidence. *Sherman*, 203 Ill. 2d at 276. "A decision is against the manifest weight of the evidence only when an opposite conclusion is apparent or when the findings appear to be unreasonable, arbitrary, or not based on the evidence." *Eychaner v. Gross*, 202 Ill. 2d 228, 252 (2002).

¶ 35     In the case at bar, the parties agree that the trial court granted Skehan's motion based on the second prong, namely, that there was insufficient evidence to establish plaintiff's *prima facie* case. Accordingly, we will affirm the trial court's judgment unless it was against the manifest weight of the evidence.

¶ 36     The issue presented in the instant case is whether there was sufficient consideration for the guaranty purportedly signed by Skehan. We considered this issue in the first appeal, and the law concerning it remains the same. If a guaranty is executed after the underlying obligation was entered into, new consideration is generally needed for the guaranty. *Tower Investors, LLC v. 111 East Chestnut Consultants, Inc.*, 371 Ill. App. 3d 1019, 1028 (2007). However, if a guaranty is executed contemporaneously with the original contract, the consideration for the original contract is sufficient consideration for the guaranty and no new consideration is required for the guaranty. *Tower Investors*, 371 Ill. App. 3d at 1028; *Pedott v. Dorman*, 192 Ill. App. 3d 85, 94 (1989); *Continental National Bank of Fort Worth v. Schiller*, 89 Ill. App. 3d 216, 219-20 (1980); *Vaughn v. Commissary Realty, Inc.*, 30 Ill. App. 2d 296, 302 (1961).

¶ 37     In the case at bar, the trial court found that the guaranty was executed after the lease agreement had been executed and therefore required new consideration to be enforceable. However, plaintiff argues that the evidence demonstrated that the guaranty was executed contemporaneously with the lease agreement, relying primarily on the case of *Vaughn v. Commissary Realty, Inc.*, 30 Ill. App. 2d 296 (1961). As we noted in our prior opinion, in that case, on or about February 11, 1957, the plaintiffs entered into a lease for real estate in Champaign with the defendant, a corporation. *Vaughn*, 30 Ill. App. 2d at 297. The lease provided in part that the defendant would not be liable for any default in rental payments by an assignee of the lease. *Vaughn*, 30 Ill. App. 2d at 298. Approximately nine days later, on February 20, 1957, the defendant executed a guaranty, guaranteeing performance by its assignees by paying any unpaid rent or paying a set sum that was based on the time the default occurred. *Vaughn*, 30 Ill. App. 2d at 297-98. Later, one of the defendant's assignees defaulted on the lease by failing to pay the rent. *Vaughn*, 30 Ill. App. 2d at 299. The plaintiffs brought suit against the defendant, seeking a monetary judgment under the terms of the guaranty. *Vaughn*, 30 Ill. App. 2d at 299. In its answer, the defendant argued as an affirmative defense that the guaranty was executed without consideration and was therefore void. *Vaughn*, 30 Ill. App. 2d at 300. After a bench trial, the trial court entered judgment in favor of the plaintiffs. *Vaughn*, 30 Ill. App. 2d at 300-01.

¶ 38     On appeal, the appellate court held that the evidence demonstrated that the guaranty was executed contemporaneously with the lease. *Vaughn*, 30 Ill. App. 2d at 302. The court noted

that the preamble of the guaranty "clearly indicated" that the guaranty was executed by the defendant as a part of its lease transaction and that the reason for the existence of the guaranty was the fact that, under the lease, the defendant was not liable for any default in rental payment by assignees. *Vaughn*, 30 Ill. App. 2d at 301. The court further noted that the defendant regularly leased properties and immediately assigned them to a different corporation and regularly included guaranty agreements, although the guaranty in the case was not the defendant's standard guaranty. *Vaughn*, 30 Ill. App. 2d at 301-02. The court held that the evidence in the case demonstrating the execution of the lease and the guaranty "warrants no conclusion other than that the lease and guaranty *** were part of a single transaction in which defendant procured a lease for plaintiffs' premises and plaintiffs were given an agreement guaranteeing the rent reserved under said lease." *Vaughn*, 30 Ill. App. 2d at 302. It specifically noted that the passage of nine days between the execution of the lease and the execution of the guaranty was "without significance," stating that "[t]here is no evidence in the record indicating any separate negotiations between the parties concerning the guaranty agreement. If any took place, then we must assume that defendant would have produced evidence as to the same." *Vaughn*, 30 Ill. App. 2d at 302-03.

¶ 39    We found *Vaughn* instructive in the first appeal, noting that, like in *Vaughn*, the passage of several days between the execution of the lease and the execution of the guaranty was not dispositive because plaintiff had sufficiently alleged that the two were executed contemporaneously as part of a single transaction. *L.D.S.*, 2011 IL App (1st) 102379, ¶ 47. However, we agree with the trial court that after the circumstances surrounding the lease agreement were more fully fleshed out through Saluja's testimony, such a comparison is no longer appropriate. In *Vaughn*, the court specifically noted that "[t]here is no evidence in the record indicating any separate negotiations between the parties concerning the guaranty agreement. If any took place, then we must assume that defendant would have produced evidence as to the same." *Vaughn*, 30 Ill. App. 2d at 302-03. Here, by contrast, the record does contain evidence indicating separate negotiations. Specifically, the record indicates that Saluja signed the lease on July 20 despite believing that the lease agreement was "incomplete." According to the receipt, "the keys and the possession of the store" were given to Skehan on July 21. That day was the first time Saluja ever raised the issue of a guaranty, and the guaranty was presented to Skehan and executed on July 26, two days after Southern Cross had tendered its security deposit to plaintiff. As the trial court found, it is apparent that Saluja belatedly realized that he was contracting with Southern Cross instead of Quizno's and sought to insert a guaranty into an already-completed transaction. Accordingly, we cannot find the trial court's conclusion that there were separate negotiations to be against the manifest weight of the evidence, and the situation present in *Vaughn* is in no way analogous to the situation present in the instant case. Given the presence of separate negotiations and separate transactions, new consideration was required for the guaranty. *Tower Investors*, 371 Ill. App. 3d at 1028. Since Saluja admitted several times that there was no new consideration, the trial court's conclusion that plaintiff was unable to establish a *prima facie* case equally was not against the manifest weight of the evidence.

¶ 40    We are not persuaded by plaintiff's argument that the lease agreement was never "executed" until after Saluja accepted the security deposit, which he refused to do until after Skehan had signed the guaranty. The lease agreement does not specify that execution of the agreement is conditioned on plaintiff's acceptance of the security deposit. As the trial court

- 11 -

noted, the lease agreement simply states that "[c]oncurrently with Tenant's execution of this Lease, Tenant shall deposit with Landlord the Security Deposit," and Southern Cross did, in fact, tender its security deposit to plaintiff on July 24. Plaintiff does not provide any other evidence to suggest that execution of the lease may be delayed by plaintiff's refusal to accept the security deposit, other than Saluja's testimony as to his actions. In fact, as the trial court found, the agreement had been signed, the security deposit had been tendered, and the keys and possession of the property had been turned over, all prior to any guaranty having been presented to Skehan. In short, as the trial court found, "the lease was executed in every sense of the word." We cannot find the trial court's conclusion that the lease had been fully executed prior to the guaranty being presented to Skehan to be against the manifest weight of the evidence, and accordingly, find plaintiff's argument otherwise to be unpersuasive.

¶ 41 As a final matter, Skehan requests the imposition of sanctions for what he terms a "frivolous" appeal. Illinois Supreme Court Rule 375(b) (eff. Feb. 1, 1994) provides for the imposition of sanctions for frivolous appeals that are not taken in good faith. The imposition of sanctions under Rule 375(b) is left entirely to the discretion of the reviewing court. *McNally v. Bredemann*, 2015 IL App (1st) 134048, ¶ 24 (citing *Kheirkhahvash v. Baniassadi*, 407 Ill. App. 3d 171, 182 (2011)). In the case at bar, we decline to impose such sanctions.

¶ 42                                           CONCLUSION

¶ 43 For the reasons set forth above, the trial court's conclusion that plaintiff could not establish a *prima facie* case was not against the manifest weight of the evidence, where the testimony of plaintiff's principal established that the guaranty and the lease agreement were two separate transactions, requiring new consideration for the guaranty.

¶ 44        Affirmed.