2023 IL App (1st) 230212

No. 1-23-0212

Second Division
December 29, 2023

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

| | | |
|---|---|---|
| *In re* MARRIAGE OF | ) | Appeal from the |
| | ) | Circuit Court of Cook County, Illinois |
| MELISSA K. LARSEN, | ) | |
| | ) | |
| Petitioner-Appellee, | ) | |
| | ) | |
| and | ) | No. 2017 D 7318 |
| | ) | |
| DAVID A. LARSEN, | ) | Honorable |
| | ) | Naomi A. Schuster |
| Respondent-Appellant. | ) | Judge, presiding. |

_____

JUSTICE COBBS delivered the judgment of the court, with opinion.
Justices McBride and Ellis concurred in the judgment and opinion.

**OPINION**

¶ 1     This case stems from postjudgment dissolution of marriage proceedings between petitioner-appellee Melissa Larsen (Melissa) and respondent-appellant David Larsen (David). Pursuant to a marital settlement agreement executed in 2019, David was ordered to pay lifetime indefinite monthly maintenance payments to Melissa. However, in 2021, David filed a petition to terminate such payments, alleging that Melissa was cohabiting with another party on a "resident, continuing conjugal basis" and that the relationship constituted a *de facto* marriage pursuant to

section 510(c) of the Illinois Marriage and Dissolution of Marriage Act (Act) (750 ILCS 5/510(c) (West 2020)).

¶ 2    Following a four-day hearing and at the close of David's case-in-chief, Melissa made an oral motion for a directed finding that David had failed to meet his burden on his petition. Following briefing, the trial court agreed with Melissa and held that David failed to establish that Melissa and Brent Sell were in a *de facto* marriage. David appeals from that judgment, arguing twofold that: (a) the trial court erred in finding that David failed to establish a *prima facie* case of cohabitation; and (b) alternatively, the court's denial of his petition was against the manifest weight of the evidence. For the reasons that follow, we affirm the decision of the trial court.

¶ 3                                    I. BACKGROUND

¶ 4                         A. The Parties' Divorce Proceedings

¶ 5    The following facts are derived from the record on appeal. David and Melissa were married on June 27, 1992, in Du Page County, Illinois. The parties' marriage resulted in four children, two of whom passed away during the marriage. On August 23, 2017, Melissa filed a petition for dissolution of marriage in the circuit court of Cook County. At the time of the proceedings, the couple lived in Illinois, and their two remaining children, Lea and Ian, were minors. On August 31, 2017, David filed a counterpetition and a response to Melissa's petition.

¶ 6    On December 18, 2019, the trial court entered a judgment for dissolution of marriage, which incorporated, among others, the parties' separately executed marital settlement agreement (MSA) and an allocation judgment of parental responsibilities and parenting plan.[1] The December

---

[1]According to David's petition, as well as the December court order, the MSA was incorporated into the dissolution judgment solely by reference. The record on appeal only provides the relevant portions of the MSA.

order further provided that the MSA could not be modified without any subsequent court action and express consent of the parties. Relevant here, article II of the MSA governed the payment of maintenance by David to Melissa. Specifically, section 2.2 awarded Melissa 120 months of nonmodifiable "lifetime indefinite maintenance" in the amount of $8237 per month. Section 2.5(4) further provided that, after 120 months, David was allowed to petition to modify his maintenance obligations based on the following conditions: (1) David or Melissa's death; (2) the date of Melissa's possible remarriage; or (3) Melissa's cohabitation with another person on a resident, continuing, and conjugal basis.

¶ 7                                B. Procedural History

¶ 8                                1. *David's Petition*

¶ 9     On September 20, 2021, pursuant to section 510(c) of the Act and section 2.5(4) of the MSA, David filed a petition to terminate his maintenance payments based on Melissa's cohabitation with another person on a resident, continuing, and conjugal basis, which had risen to the level of a *de facto* marriage. Specifically, David alleged that Melissa had been in a relationship with Brent Sell (Brent) since November 2014 and that the two had been cohabiting since or before May 26, 2021, when Melissa sold the parties' former marital residence in Palatine, Illinois, and moved to Hoffman Estates, Illinois. David further requested reimbursement for any payments made to Melissa since the date of cohabitation.

¶ 10    Melissa filed a response, which denied most of David's allegations. Melissa conceded that the alleged circumstances of her and Brent's relationship could be characterized as an intimate dating relationship, but she denied that David could establish "marital behavior" based on the lack of evidence regarding the couple's commingling of finances or financial partnership.

¶ 11                          2. *Hearing—David's Case-in-Chief*

¶ 12 A hearing on David's petition was conducted electronically. We have culled through the extensive testimony and recite the most salient portions herein.

¶ 13                                              i. Melissa

¶ 14 On direct examination as an adverse witness, Melissa testified as follows. She began an exclusive, monogamous, and sexual dating relationship with Brent in August 2014, which continued until December of 2015. At the beginning of the relationship, the two lived about a mile from each other. Melissa briefly and exclusively dated another individual in October 2016, went on dates, and filed for divorce from David on August 23, 2017. She resumed her relationship with Brent in January 2018, and their relationship had since been sexual and monogamous in nature. Now, Brent lived in an apartment in Palatine, which was about 5½ miles from her current residence. Brent was also divorced, but she did not know when his divorce had been finalized.

¶ 15 Melissa denied that she and Brent were engaged or that he had ever given her a ring. They had not discussed marriage, as they were "just dating" and she was "not ready for that commitment at this time." Melissa did not have any future plans and admitted that dating came "secondary" to her children. The two had not discussed living together because she currently did not wish to live with anyone or deal with another person living with her and Ian and the "frustrations that go along with it." The two were not listed as "in a relationship" on social media, but Melissa knew there were pictures of the two together on Facebook or Instagram. She also had a few pictures of her and Brent around her house.

¶ 16 Melissa denied having any conversations with Brent concerning her maintenance payments but admitted that they had discussed what it meant to "cohabitate" after David filed his petition. Prior to her receipt of the petition, she believed that "cohabitation" meant that "people were living together." She and Brent now understood it to mean "the rules listed for cohabitation that the court

looks for in cases like this," and both did not believe that they were cohabitating "based on those five or six things that the court might look for." She denied discussing "cohabitation" with Brent prior to receiving the petition.

¶ 17    On May 27, 2009, Melissa sold her and David's former marital residence in Palatine for $499,000.[2] Melissa paid the remaining mortgage balance of $57,518.32 and retained the net proceeds of the sale, which was $393,738.68. She used some of the net proceeds to purchase her current residence, which was located in Hoffman Estates. She had purchased that property for $405,000, subject to a $105,000 30-year mortgage. Melissa took out a mortgage because she wanted to remodel the kitchen and bathrooms, as well as purchase new furniture. The remaining proceeds of the former home's sale of about $50,000 were placed in a savings account, of which she had since used about $10,000.

¶ 18    Melissa was shown a copy of her financial affidavit prepared on November 12, 2021, which averred that her monthly mortgage payments were around $1050, household expenses at $5549.23, and total living expenses at $10,205.02. She testified that no one contributed or helped her pay for such expenses, which were otherwise paid through child support, maintenance payments, or money from her savings account. She had not been employed at the time the affidavit was completed, and she had used money from her savings account to pay for her legal expenses. At the time the affidavit was completed, she had about $9000 in her checking account but did not know its current balance offhand. Her savings account balance had been at $96,819.33 in November 2021, with its current balance somewhere around $50,000. Melissa's savings account held funds from refund

---

[2]The parties stipulated that the Palatine home had been purchased by the former couple in 2002 and that since the divorce Melissa had been responsible for the remainder of the mortgage. The parties further stipulated that David had held an equity line of credit against the home, which he paid off on April 6, 2021.

checks, as well as maintenance and property payments from David. She had also placed funds from some of those sources into her investment accounts.

¶ 19    Melissa testified that she bought the new property because she had desired to be in a different home, which she had wanted even when she and David had still been together. Melissa's move meant that Ian had to change school districts, although she had tried to find a home in the same area amidst the "crazy" housing market in 2020. When asked if she could have utilized other assets to purchase the home or pay for renovations, Melissa indicated that she had money in a savings account and her Edward Jones brokerage account. She did not recall how much money was in either account prior to her purchase.

¶ 20    Melissa was the sole owner of her current residence and had worked with a realtor to find it. Her sister also assisted her by touring homes with her in person. Brent had not assisted her with the home tours and had not helped her find listings, but Melissa admitted that she may have discussed a particular home with him. Melissa toured her current residence once prior to her purchase, with both her sister and realtor present. However, Brent was present when she conducted an in-person inspection of the property. Melissa did not recall the date but knew it had occurred prior to her move on May 28, 2021, and had lasted for over an hour. Brent was primarily there to listen to the inspector's assessment of the home's condition. He did not voice any concerns or make any comments related to the inspection, nor did he advise Melissa to raise certain questions or issues regarding the property. Melissa recalled him speaking during the inspection but could not recall what he said. Brent was not present at the in-person closing of her current residence, and Melissa was unaware if Brent had visited it on his own prior to the closing or move.

¶ 21    Melissa hired movers for her move and denied that Brent had paid for them. Brent arrived in the morning to help her pack up items at the old residence and then put them in his car. He

further directed the movers at Melissa's old residence while she attended the home's closing that morning. Melissa's sister also assisted her that day, as well as various friends who unpacked boxes in the kitchen at her new home. Melissa did not recall if Brent assisted in unpacking boxes. Melissa's son Ian was also with her that day, but he stayed at her sister's home for most of the time and did not assist in the move. Melissa did not know if Ian and Brent had been alone together at the old home at any point during the day, but she considered it to be possible. Brent did not spend the night at her former residence prior to the closing of her new property.

¶ 22    Melissa denied that she and Brent lived together or had in the past, with the longest time they had spent overnight together being during a six-day vacation visiting her daughter. They did not spend much time at Brent's apartment and were usually at hers. She could not recall how many times she had been to his apartment but knew she had spent the night at least once. When confronted with her deposition testimony where she testified that she had "never" spent the night at Brent's prior to March 11, 2021, Melissa did not recall this statement but believed she had previously testified to "spending evenings" there. She denied that Ian had ever spent the night at Brent's home and also did not remember stating during her deposition that Ian had "never been" there. She did not have a key to his apartment. The two had not cooked meals at his home with Ian present. She could not remember if she had bought groceries for his home but had likely done so.

¶ 23    At her former residence, Brent likely stayed overnight "more than 40 times." She denied that he had stayed overnight in 2016 and 2017 but also testified that he had likely stayed at her former home after David moved out of the house on April 2, 2016. She was unsure of how many nights he stayed in 2018 and 2019. If he had stayed "consecutive nights," it would be dependent on when Ian was with his father; if he was, Brent would stay with Melissa Friday and Saturday night. However, she denied that he stayed overnight with her every weekend Ian was with David.

It was also possible that Brent may have spent the night when Ian was home. Melissa was unsure if he had also stayed overnight when Lea was at home in 2018 and parts of 2019.

¶ 24    Melissa underwent hip surgery sometime in 2018 or 2019, and Brent stayed with her about four consecutive days or a "few nights" when Ian was present to help care for her. Brent drove her to and from the hospital but did not accompany her at any postoperative visits. Melissa's surgery required her to stay in the hospital overnight, but Brent did not stay with Ian alone that night and did not take him to school during that time. Ian and Brent were both present at the home one or two nights following the surgery, but Melissa denied that Brent had assisted with caring for Ian on those days. Brent's main concern was helping her after surgery, such as getting in and out of bed, monitoring her progress and blood pressure, and making sure she was doing her recovery exercises.

¶ 25    Brent did not have a key to her current residence but had her garage door code. She could not recall when she had given him the code. With it, Brent could enter the home through the garage door without her being present, assuming the inner door to the home within the garage was also unlocked. She usually kept this door locked when she was home. When asked why Brent had the garage code but not a key, she responded that, when she left her house, she did not lock the garage door to the home and only did so if she was by herself or with her children. She would otherwise leave it unlocked if she knew someone was coming. Melissa admitted that Brent had been alone in her current home "more than three" but "less than twenty" times. Brent had also been alone with Ian at her home at least twice. The first time had occurred when she attended a school event, but she was unable to recall the date. The second time had been on Labor Day in 2021 when Melissa attended her girlfriend's birthday party. Ian did not want to attend, and Brent offered to stay with him. Melissa denied that Brent had ever attended a formal school event for Ian and Lea.

¶ 26    Brent spent the night at her current home when her children were with David. He usually parked in her driveway but had parked in her garage in the past. She did not know his license plate number but knew he drove a black Nissan Murano. She estimated that he was at her house two times a month, from Friday through Sunday, and would spend about four overnights at her home monthly. Occasionally, Brent would be at her home during the week, but it was not "routine," as he had recently been traveling for work. Melissa would normally only see him on the weekends with the exception of a "random day" during the week. She could not say with "100%" certainty that he had never spent the night during the week.

¶ 27    At her former residence, Brent assisted her with maintenance and yard work, but she denied that he had done so on a regular basis. Melissa had hired a maintenance company to mow the loan, but Brent would assist her with fall or spring clean-up about three to four times in 2020 and 2021. Brent had also assisted her with pool maintenance, specifically with problems concerning the pool's motor and one of the pool valves, which she was not strong enough to remove on her own. Finally, Brent had also assisted her with a leak in her washing machine and successfully repaired the machine. She did not recall if the repair required the purchase of any materials or parts.

¶ 28    Since she purchased her new home, Melissa bought new furniture and a sliding glass door, which she denied Brent assisting her with. Melissa also planned to renovate the kitchen, bathrooms, and flooring. However, those plans were "indefinitely" on hold until the current litigation was resolved. Although she had told Brent the plans were on hold, she denied discussing with him why the plans were delayed or whether her maintenance payments would go towards her renovation expenses. "It would depend" if she planned to do any of the renovations herself, but she anticipated that Brent would assist her with putting in new flooring, as she had never done it on her own and the two had discussed the project prior. She intended to hire a contractor for her

kitchen project but had not yet retained one. She did not anticipate Brent's assistance with her bathroom renovation. She had not asked Brent to help her find a contractor and instead asked various people in the neighborhood for recommendations. Although Brent worked at Home Depot, she had not thought to utilize his experience in the field to help locate a contractor.

¶ 29    At her new home, Brent assisted her with some maintenance and home improvement projects, such as cutting down bushes and trees, collecting leaves, and other fall clean-up chores. He had also assisted her with installing outdoor lighting, as well as the storage and removal of outdoor furniture. His assistance was infrequent, and she estimated it to be three to four times a season. Inside the home, Brent had helped her redo an office closet by removing the clothing rod and closet doors, installing shelving units, and putting up baseboard around the closet. Brent also replaced a ceiling fan in the family room, unclogged a drain in her dishwasher, and assisted her with hanging pictures. Finally, Brent had also installed a new garbage disposal in August 2021, which he purchased with his debit card, and Melissa later repaid him with cash. She did not pay him prior to the purchase, as she had been unsure of the cost. Melissa did not recall if Brent had purchased any other items for her home other than light bulbs, because she had "strange ones" in her home and finding their replacements had been "a challenge." For any item Brent purchased on her behalf, Melissa reimbursed him for the expenditure.

¶ 30    With regard to meals, Melissa testified that Brent would eat dinner with her and Ian during the week on "rare occasions," but they did not have regular dinner dates. Melissa would invite him over for dinner when Ian was home if she had not seen him in a while, and "on occasion" Brent would cook for her and Ian. If the two were cooking together, Brent might come over with groceries. The two also dined out "on occasion" during the week, sometimes with Ian. They either split the cost of meals, or Melissa would cover her and Ian's share and Brent would cover his.

However, there were occasions when one of them paid for the other's meal. Melissa did not feel that Brent should have to pay for all her meals, but he was "insistent" on doing so because they were dating. She denied that he paid for a majority of meals because she "[fought] him on it."

¶ 31    Melissa and Brent had several groups of friends with whom they socialized. The two shared a common friend group but also had their individual groups of friends. She had hosted their mutual friend group at her home in summer or fall 2021, where they had dinner, sat outside, and chatted. Melissa had not since hosted because the group normally rotated dinners at each other's homes and they had not yet been back to hers based on "the way it worked out." She and Brent also cohosted birthday parties and other gatherings at Melissa's residence, but she denied cohosting holidays. She estimated that they had entertained guests together at her home three times this year, which "ha[dn't] been very much."

¶ 32    Melissa denied that either she or Brent were signatories on either's financial accounts. She did not know his PIN number and had never provided any of hers to him. Melissa was aware that he had an account with Chase Bank but did not recall if she had told him where she held accounts. Melissa denied giving Brent cash on any occasion with the exception of reimbursement for items purchased on her behalf. Melissa and Brent used Zelle to otherwise exchange money a "handful of times." In the event that Melissa paid for both their dinners, she would pay via cash or credit card because she did not have a debit card. She did not know or remember how many cash transactions had taken place and admitted these transactions had not been accounted for in her discovery responses. She did not recall receiving any cash or a Zelle payment from Brent from January 1, 2020, through the present. Melissa did not have an emergency contact at work but would have named her sister as one because she was designated as such on "other things." Melissa did

not have a will but planned to prepare one. She did not intend to name Brent as a beneficiary or trustee. She was unaware if Brent had a will or if she was his beneficiary.

¶ 33    Melissa testified that she had met some members of Brent's family, such as his mother, stepfather, son, and siblings. She had not hosted any of his family members at her current home, and he had not done so for hers. She had hosted her own family at her residence with Brent present "maybe twice." Brent's son had been at her former residence in June 2020 to celebrate Brent's birthday with friends and some family, including Melissa's sister and brother-in-law. She did not recall if Lea or Ian had been present that day. Brent's son did not spend the night, and when asked if Brent had, Melissa speculated that he had if Ian and Lea had not been present.

¶ 34    Brent and Melissa had exchanged gifts over the years for birthdays and holidays, with one such instance being her purchase of tickets to a Michael Buble concert for Brent's last birthday.[3] Brent had also bought her children Christmas gifts in the past two years, including a Visa gift card and blanket for Lea for Christmas 2020 and some games and a baking soda kit for Ian in Christmas 2020 and 2021, respectively. Melissa had given Brent's son a Christmas gift in 2021, specifically

---

[3]The parties stipulated to the following gifts purchased by Melissa for Brent over the past few years: (1) Macy's sunglasses purchased for $105.60 on May 29, 2020; (2) Tommy Bahama shirts purchased for $237.60 on November 13, 2020; (3) an item from Sharper Image for $79.14 on November 17, 2020; (4) an item from Williams Sonoma for $35.35 on December 19, 2020; (5) two Netflix gift cards for $60 and $30, respectively, purchased on December 9, 2020; (6) an item from Macy's for $29.70 purchased on December 23, 2020; (7) candles from Home Goods for $14.99, purchased on December 23, 2020; (8) an electric toothbrush purchased for $113.27 on May 20, 2021; (9) an item from Dick's Sporting Goods for $165.19 on November 29, 2021; and (10) a fleece jacket from Land's End for $55.96, purchased on December 9, 2021.

The parties also stipulated to the following gifts purchased by Brent for Melissa during the same time period: (1) an item from Bed, Bath and Beyond for $107.48, purchased on December 7, 2020; (2) an item from WeatherTech for $45.91, purchased on December 10, 2020; (3) an item from Tiffany & Co. for $349.38 on December 14, 2020; (4) an item from Target for $393.78 on July 12, 2021; and (5) an item from Best Buy for $494.98, purchased on November 17, 2021.

a candle and some cookies, although she had not purchased the candle with Brent's son in mind. She did not believe Brent had ever bought a birthday gift for either Ian or Lea.

¶ 35    Melissa and Brent celebrated various holidays and birthdays together, such as New Year's Eve in 2018 and 2019 and Christmas Day. Melissa and Brent traveled to Jacksonville, Florida, to visit and stay with Brent's mother and stepfather during the Thanksgiving weekend in 2019. However, they had not spent any other Thanksgiving together and would not for the upcoming year, as Melissa would be hosting and would have her children present. Brent would likely be at her home Christmas Day after the children went to David's house. The couple had spent their birthdays in 2018 through 2022 together. She also believed that, when she celebrated her birthday with Ian and other family members, Brent had also been present. Neither Ian nor any of Brent's family members had been present for Brent's birthday this past June. She and Brent celebrated her sister's birthday together in 2020, 2021, and this past year, where they shared the cost of taking her sister out to dinner.

¶ 36    With regard to vacations,[4] Melissa testified that she and Brent had traveled together, with some trips including her children and other trips just being the two of them. Aside from their stipulated vacations, the two also took the following trips. In May 2020, she and Brent traveled to Eagle, Wisconsin, and stayed overnight with their mutual friends. During their Lake of the Ozarks

---

[4]The parties stipulated to the following vacations taken by Brent and Melissa: (1) Jacksonville, Florida, over Thanksgiving weekend 2019 to visit Brent's mother and stepfather; (2) Lake of the Ozarks and Stark Caverns, Missouri, with Ian from June 29 to July 6, 2020, to visit Lea; (3) Starved Rock, Illinois, during the weekend of October 16, 2020; (4) New Buffalo, Michigan, during a weekend in February 2021; (5) Philadelphia, Pennsylvania, for the weekend of June 20, 2021; (6) Eagle, Wisconsin, for the Fourth of July weekend 2021; (7) Starved Rock, Illinois, and Elkhorn, Wisconsin, with Ian during Labor Day weekend 2021 (although Melissa testified on the stand that the year may have been 2020); and (8) the University of Missouri to visit Lea on October 15, 2021. The various expenses incurred by the parties during such trips are also included in the same stipulations. We recite any additional testimony concerning these vacations to provide further context of their nature.

trip with Ian, they stayed in a hotel. Lea joined them for some activities, which included cavern tours, a boat rental, going to a beach, and eating out at restaurants. Brent paid for the airfare for the couple's Philadelphia trip. From June 23 through June 27, 2021, Brent and Melissa visited Lea at the University of Missouri. The two stayed in a hotel, and Lea joined them for meals and other activities. Melissa paid for gas and two meals, and Brent paid for other expenses. In July or August 2022, Brent and Melissa again traveled to Eagle to visit friends for an evening. The two also took day trips to Wisconsin, specifically to Fontana, Lake Geneva, and Twin Lakes. She believed Ian had been present for the Twin Lakes trip, which likely occurred during a Fourth of July weekend. Melissa had also taken trips without Brent, such as in January or February 2022, where she spent a weekend with a girlfriend in Eagle.

¶ 37    Melissa planned on traveling to Arizona sometime next year but was unsure of the dates. Brent was aware of the trip, but Melissa did not yet know if she would take him or Ian with her. She and Brent had "loosely" discussed traveling over spring break, as well as visiting Brent's mother and other out-of-state family in Houston, Texas, sometime after Christmas this year. The two had discussed international trips to Mexico or the Dominican Republic but had not yet planned a trip and currently had no plans to do so. Finally, Melissa planned to travel to Missouri for her daughter's college graduation over Mother's Day weekend next May. Melissa planned to take Ian with her but did not plan to take Brent because the event was "for [her] daughter]" and they "we[re] just dating." Melissa admitted that Brent had traveled with her previously to visit her daughter but stated that such past travels did not mean that she "would include him in this," and she did not "feel it's necessary that he needs to be there." She denied that the pending litigation had any impact on her decision not to invite him.

¶ 38 Upon cross-examination, Melissa testified as follows. Brent did not have any title or ownership interest in her home and was not contributing to the mortgage. She knew that Brent's apartment had running water, electricity, heat, a television, and various appliances. Upon redirect examination, Melissa testified that she was unaware of the exact unit number of Brent's apartment. She knew it had functioning utilities because she and Ian had helped Brent move from one unit to another in July. She was unaware if he had purchased new furniture.

¶ 39                                        ii. Brent

¶ 40 On direct examination as an adverse witness, Brent testified as follows. He denied having any conversations with Melissa about her dissolution judgment, maintenance, or potential termination of maintenance and was unaware of the amount she received monthly. He admitted to discussing the meaning of cohabitation with her after the case had been filed, but he still did not know "exactly" what it meant. He assumed that "cohabitation" meant "living in the same location" or "living together" but did not know if that was the right "legal" definition. He denied discussing the matter with anyone other than Melissa.

¶ 41 Brent had defined his relationship with Melissa as "exclusive" since 2018. In August 2014, the two began to "talk[ ] to each other" and had "just formed" a relationship. At the beginning, it had not been exclusive and was just a "dating relationship." However, he admitted that their relationship had been sexual at that time. When they first began to see each other, Brent had been married. Brent denied being in a relationship with anyone other than his ex-spouse and Melissa in his lifetime.

¶ 42 Brent's relationship with Melissa ended briefly in February 2016, when David discovered a text message between the two of them. Between February 2016 and September 2017, the two did not have any physical or electronic contact with each other. The two reconnected in September

or October 2017, when they saw each other at a local street fest. However, the relationship did not become romantic again until the end of 2017, when Brent divorced his wife and Melissa was undergoing her own divorce proceedings. During this time period, Melissa and Brent did not spend any time with each other's family members and did not travel together but had mutual friends.

¶ 43    Currently, the two did not have any plans to move in or buy a property together. Brent denied ever buying a ring for Melissa. When asked if he and Melissa had discussed the future of their relationship, Brent responded that they "want[ed] to keep the relationship the way it is right now, as an exclusive dating relationship" and that they wanted "to continue dating each other." Brent had photos of himself and Melissa in his apartment, and he knew she also had photos of them in her home. When asked if the two were listed as "being in a relationship" on social media, Brent responded that he did not know. He admitted to having a Facebook and LinkedIn profile but stated that he did not post anything on Facebook. He had visited Melissa's page "a long time ago" but did not remember looking at that part of the site or if she had posted anything on her page. He denied that either had asked each other to refrain from posting photos of each other.

¶ 44    Brent and Melissa communicated over e-mail and by phone. The two sent texts to each other every day and spoke on the phone "at least once a day" "but not everyday." Brent did not have a landline at his apartment and had just recently purchased a personal cell phone. He had possessed a work cell phone previously, but his company was changing their cell phone numbers. Brent had previously sent texts to Melissa on his work phone but deleted texts "regularly" to keep his "inbox pretty clean," as he received "hundreds" of text messages a day. He did not recall being asked to provide texts between himself and Melissa during discovery but believed he would be unable to because he did not have access to his work "phone system." He also did not provide a call log because he did not have access to one. He denied deleting any texts on his new personal

phone because he had "just started giving the number out" but later admitted that he had deleted texts.

¶ 45    Brent and Melissa did not live together and never had. At the time of his divorce, he lived at a different address, which had been a few miles away from Melissa's former residence. Brent then moved to his current residence in 2018, which was a one-bedroom apartment in Palatine. He previously resided in another unit in the same complex but moved to his current one in July 2022 when the owners of the property began remodeling the units. Brent intended to remain in his current unit. Brent's lease was month-to-month due to the remodeling project, and he indicated that "everyone in the whole building [wa]s on month-to-month." His prior lease before the remodeling project had been annual, and he intended to sign a similar lease once the projects were completed. Brent did not currently intend to purchase a property on his own.

¶ 46    Brent's current residence was about 15 or 20 minutes away from Melissa's, and she had been to his apartment "probably less than five" or "less than ten" times. He did not recall Melissa staying the night at either unit. He believed Ian had visited his previous unit during a walk-through of Melissa's old residence when she needed a place to stay for a few hours. Brent had been out of town at the time but gave Melissa his key. Melissa did not currently have a key to his apartment, and he had not given her one on any other occasion. Lea had never been to his apartment, and Ian had never spent the night. Melissa did not keep any personal items at his apartment and had never purchased groceries for him. He estimated that they had eaten "less than five" meals at the previous unit, with Brent cooking the meals. They had not eaten at his new unit because Brent was out of town a lot for work since March 2022 and had not "really been around since July."

¶ 47    Since March 2022, Brent had been employed at Home Depot as a regional delivery manager. His new position required him to travel all over the country every week for work, and he

was usually gone between three to five days a week, and he anticipated his future travel to remain the same. Brent denied that Melissa had ever traveled with him or met him at a location for work. On the nights that he did not travel, he usually stayed at his apartment. If Melissa did not have Ian, he would stay the night at her home.

¶ 48 Brent did not recall how many nights he had spent at Melissa's former residence. He estimated that he had spent two to four overnights there per month, but he denied spending every weekend at her home whenever Ian was not present. He further denied staying overnight at her former residence alone. He did not remember staying at the former residence when both children were home, but then he later testified that this had occurred following Melissa's hip surgery in 2019. Brent drove her home the night after her surgery and stayed one night to assist her with getting in and out of bed. He believed Ian and Lea had been at the home that day, but they spent most of their time together, and Brent did not assist them "too much."

¶ 49 Brent had not participated or assisted Melissa in her search or home-buying process but was present at the inspection of her current residence to answer any of her questions. He spoke directly to her and not the inspector. He could not recall what questions she had. The inspection had been the first time he had been at the property prior to its purchase, and he did not remember the date. On the day of her move, Brent did not attend the closing but assisted Melissa by packing up boxes and staying with the movers while she was at her closing. However, the movers "didn't need much direction," and he was only present because "nobody else was there." Brent denied paying for the movers or contributing financially to the property's purchase.

¶ 50 Brent knew the garage code to Melissa's current residence and could enter her home that way if she left the second door unlocked. He did not know if Melissa "always" left that door unlocked when she was not home, but he stated that he had "always" been able to come into the

home without any issue. Brent denied having a key to her home but stated that there "was no need for [him] to have one" because he could enter through the garage. When he came to her home, he always parked in the driveway. He admitted being alone in her home by himself or with Melissa's children at least twice, once when he watched Ian while Melissa attended a parent-teacher conference and another time when he installed a garbage disposal for her in June or July of last year.

¶ 51    Brent assisted Melissa with upgrades and improvements at her prior residence, which included painting her office, landscaping, and pool maintenance. At her current residence, he assisted her with plumbing, installing shelving in her closet, and installing a garbage disposal. He did not recall assisting her with installing closet doors. He would assist her with landscaping once or twice during the season, which ran from April to September. With regard to the garbage disposal, Brent purchased supplies to install it, and Melissa later reimbursed him, although he did not recall if she did it with cash or electronic payment. He purchased the supplies first because she was not going to be home during the installation. When asked if he "often" purchased items for her and then later received reimbursement, he responded "not all the time" and believed that was the only time because, for any other projects, the two would meet at the store and she would pick her desired items. He could not recall if Melissa had ever purchased items on his behalf. He did not recall doing any other chores around the house when Melissa was not present.

¶ 52    Brent denied that the two had ever assisted each other with payment for household expenses. Brent was aware of Melissa's future plans to renovate her home based on their prior discussions, which included painting and putting in new carpet. They had not discussed who would be completing the renovations or whether he would help her find a contractor. If she asked him to do the renovations for her, he would do as much as he could "as he would for any other friend."

- 19 -

He could not recall whether they had discussed any other projects. He was not eligible for discounts at Home Depot for such projects.

¶ 53    Brent did not eat dinner frequently at Melissa's house during the week and said that "once a month would be a lot." Prior to traveling for work, he would eat dinner there during the week once or twice a month. Ian was present for at least one of the meals, but Brent could not remember if he had ever cooked for him or Lea. Brent denied ever buying groceries for Melissa's home. Since his work travels began, the two had not shared any meals during the week and would generally only see each other on the weekends. Then, they usually went out to eat and would either split the bill or take turns paying.

¶ 54    Brent did not keep any personal items at Melissa's home, such as clothes, a toothbrush, or deodorant, because he did not stay there "enough" to leave items. He denied bringing an overnight bag because he slept naked, left in the morning, and brushed his teeth at his apartment when he returned home. He did not bring a cell phone charger, as he had one in his car and his phone was "always pretty charged."

¶ 55    Brent and Melissa shared a mutual friend group as well as their own separate groups, but both spent "infrequent" time with either's separate group. They usually socialized with their mutual friend group a couple times a month and usually on weekends. Brent denied cohosting the events with Melissa but admitted that he had assisted her with grilling, moving furniture, and setting up chairs outside. Melissa hosted a few parties after she moved into her new home, with one for their mutual friends and another for her family members, such as her sister, brother, father, and stepmother. Although his son had been to Melissa's former residence once in 2019 for a birthday party Melissa had hosted for him, none of his family members had yet been to her new home.

¶ 56 Brent had purchased various holiday and birthday gifts for Melissa over the years, including a coffeemaker for her last birthday. He could not recall what she had given him for his. Brent had also bought Christmas gifts for Lea and Ian the year prior but could not recall that he had done so otherwise. Melissa gave his son a Christmas gift one year, which included a candle and cookies. Brent intended to buy Melissa and her children Christmas gifts for the upcoming year.

¶ 57 Brent and Melissa did not spend all holidays together. With the exception of spending Thanksgiving with his mother in Jacksonville, Florida, the two had not spent Thanksgiving or Easter together. They had not spent Christmas Eve together since 2018 but spent the later part of Christmas Day together for the past two years. They had celebrated New Year's Eve and Valentine's Day together, but he could not remember which years. The two usually celebrated their birthdays together but not always on the actual day. They had celebrated Melissa's father's birthday together one year, but he could not remember the date. He did not recall spending any other family birthdays together, including Lea and Ian's birthdays.

¶ 58 Brent and Melissa had traveled together since 2018 and usually shared expenses for the hotel, airline tickets, or gas. They would usually reimburse each other for any up-front expenses depending "on how things break out" via Zelle or cash. The two had traveled to Eagle, Wisconsin, in May 2020, to visit a mutual friend who owned a lake house; to the Ozarks in 2021; to Pennsylvania for the weekend in June or July 2021; and to New Buffalo, Michigan, in 2021. Brent purchased the airplane fare for the Pennsylvania trip, and Melissa reimbursed him. Brent believed Melissa paid for the hotel in New Buffalo. The two had also traveled with Ian to the Ozarks in 2020 and had taken him on day trips to Starved Rock and Wisconsin. Brent denied taking any other trips to visit his out-of-state family members, but the two wished to travel to Galveston,

Texas, at the end of the year to visit Brent's mother and brother. However, those plans had not yet been set.

¶ 59    Brent and Melissa did not share any joint financial accounts. The two were not signatories on each other's accounts, did not know each other's PIN numbers, and were not authorized users on any of their credit cards. Brent's son was the beneficiary of his life insurance policy as well as his emergency contact at work, and he was unaware if Melissa had listed him as her contact. He did not have a trust, will, or power of attorney and was unaware if Melissa did. Brent denied possessing any records of cash transactions between them.

¶ 60    On recross-examination, Brent testified as follows. He had not assisted Melissa with her down payment or mortgage for her current residence. He had not contributed any money to her electric bill, gas bill, utilities, or upkeep expenses and had no intention of doing so or asking Melissa to pay his. He had not purchased any furniture or new decor for her. Brent and Melissa did not share any credit cards or joint bank, savings, investments, or cryptocurrency accounts, and he did not intend to open any with her. The two did not own any vehicles together. She was not a beneficiary on any of his accounts. They did not share a golf or other club membership. His current residence had running water, electricity, and heat. Brent had taken solo out-of-state trips without Melissa since 2018, including to Wisconsin with some friends. He was aware that Melissa had taken trips to Michigan in 2020 and 2021 without him. Melissa had not seen his son since 2020.

¶ 61    On redirect examination, Brent testified as follows. When asked if he was not on title to Melissa's current residence because of a bad credit score, he responded that he was not listed as an owner because she had purchased it herself. He admitted that his credit had been impacted due to a previous foreclosure, which would likely impact his ability to be on title for any property, including Melissa's residence. When asked if "money [flew] freely" between him and Melissa,

Brent declined to categorize it as "free flowing" but stated that money was exchanged between them when at a restaurant together, during travel, or when he bought her garbage disposal. Brent held one membership at a health club at the Palatine Park District.

¶ 62    Brent had never lived with a prior partner other than his ex-spouse and had not thought about whether he wanted to get married again. Brent had last seen his son in June 2022. Between January 1, 2018, to the present, he had traveled without Melissa an estimated 30 times to Fond Du Lac, Wisconsin; to Hilton Head to visit his father for Christmas 2021; and to Houston to visit his mother. He did not recall whether Melissa had taken any out-of-state solo trips since January 2018, other than her Michigan trips.

¶ 63                                  iii. David

¶ 64    On direct examination, David testified as follows. He and Melissa's dissolution judgment contained an agreement concerning parenting time with Ian, where David had him every other weekend, Friday through Sunday. He communicated with Melissa about parenting time through a joint calendar. In 2021, David's parenting schedule was the same. Ian had been with Melissa on the weekends of July 16, July 23, July 30, August 13, and August 27. He was unsure if Lea had been home the weekend of August 27, but she had "possibly" been back in Illinois that month.

¶ 65                                  iv. Scott Rabin

¶ 66    On direct examination, Rabin testified as follows. He was a licensed private investigator and owner of Global Detective Agency, Ltd. Rabin employed part-time employees and worked with law firms to conduct investigative surveillance in domestic relations cases, which included cohabitation and maintenance cases. Rabin was hired by David in May or June 2021 to observe and determine Melissa's relationship status with Brent, which would include surveillance from the

end of June through the beginning of September 2021. He believed he documented every instance of surveillance with photographs.

¶ 67 Rabin was shown a series of photographs taken during his surveillance.[5] On July 4, 2021, at 9 a.m., he took photos of a property located in Hoffman Estates, Illinois, which he identified as Melissa's current residence. Rabin was also shown photographs of an apartment in Palatine, Illinois, which he identified as Brent's residence, which was further stipulated to by the parties.

¶ 68 On July 9, 2021, at 2:59 p.m., Rabin conducted surveillance at Sunset Foods in Long Grove, Illinois. He observed Melissa's car and watched her remove a child out of her vehicle and then help him get into David's car, which was a black SUV. That same day, around 4:41 p.m. at Melissa's residence, Rabin observed a vehicle that he knew to be Brent's car entering Melissa's driveway. Rabin observed Brent exit his vehicle and walk into Melissa's home through her front door. A few minutes later, he observed Brent and Melissa exit her home through her garage entrance and enter Brent's car. Rabin followed Brent's car to a restaurant in Barrington, Illinois, and observed Melissa and Brent enter a restaurant around 6:15 p.m. He remained in the parking lot and observed them leave around 8:13 p.m. He followed them back to Melissa's residence, where they entered the house through the garage door entrance around 8:32 p.m.

¶ 69 On July 10, 2021, Rabin conducted surveillance at Brent's residence at 6:29 a.m. and did not see Brent's car in the parking lot. Rabin then traveled to Melissa's home, where he arrived at 6:38 a.m. and observed Brent's car in Melissa's driveway. The garage door was closed, and no other vehicles were parked in the driveway.

---

[5]The parties stipulated that both Rabin and his associate, Steven Bobbe, could not independently identify the date and time of each photograph and thus could refresh their recollections by being shown the date or time contained within the metadata of the photos.

¶ 70    In July, August, and September 2021, Rabin continued surveillance at Melissa's house and observed Brent's car in Melissa's driveway on the following dates: (a) July 11, 2021, at 7:07 a.m.; (b) July 12, 2021, at 9:32 p.m.; (c) July 25, 2021, at 2:40 p.m., in addition to the garage door being open and Melissa's car parked inside; (d) July 29, 2021, at 10:04 p.m.; (e) August 6, 2021, at 9:19 p.m., with another unidentified vehicle in the driveway and the lights on at the home; (f) August 7, 2021, at 6:10 a.m. and 9:43 p.m.; (g) August 8, 2021, at 6:48 a.m.; and (h) September 6, 2021, at 1:56 p.m. and 2:54 p.m., which Rabin believed to be Labor Day weekend, with the garage door open with no sight of Melissa's car as to the latter date.

¶ 71    On August 21, 2021, at 7:56 a.m., Rabin observed Brent's car parked in Melissa's driveway. The garage door was closed with no other vehicles in the driveway. Later that day, Rabin observed Brent's car parked at his residence at 10:22 a.m. He followed Brent to a Home Depot in Palatine around 11:42 a.m. and was accompanied by Steven Bobbe, a part-time investigator with his agency. Rabin watched Brent enter and exit the store and then place something into his vehicle. He estimated that Brent was in the Home Depot for 1 to 1½ hours. Rabin followed Brent to Melissa's residence and observed him exit his vehicle and enter Melissa's home at about 12:13 p.m. Brent was carrying a white and blue box, which Rabin believed to be a garbage disposal for a kitchen sink. A few minutes later, around 12:15 p.m., Rabin observed Melissa standing alone outside of her home and looking toward the front door. Melissa then began watering the front lawn of her home. Rabin knew Brent was inside the residence because he did not see him leave during that time.

¶ 72    On cross-examination, Rabin testified as follows. He had been hired to prove a relationship between Melissa and Brent. Rabin and David negotiated an hourly rate for surveillance conducted by one or two people at a time. Rabin denied having any billing records to fully account for his

hours and did not send David any invoices. Instead, he told David how many hours he worked, but he did not recall the exact amount. Rabin testified that he was paid $22,000 in cash but was later confronted with his deposition testimony indicating that he had been paid $27,500. Rabin did not compile a written report on his findings because it was not requested by David, and he also did not take notes.

¶ 73 Rabin conducted surveillance on both Melissa's and Brent's homes because he understood them to have separate residences. He took photographs every time he conducted surveillance. He utilized some of his employees to conduct similar surveillance between June and September 2021. He denied reviewing their photographs but also confirmed that he had seen them before. He had not reviewed any photographs taken by Bobbe since they were first taken.

¶ 74 Rabin denied ever seeing Melissa or Brent use each other's cars. He never observed Melissa go to Brent's house and did not observe them go to any other restaurants. He did not have any specific information regarding Melissa's home improvement projects beyond the garbage disposal and did not actually know what Brent had bought from Home Depot. Rabin had recently been at Melissa's residence two weeks before trial to serve a subpoena to Brent there. He did not conduct surveillance at that time but "made note" of who was present at the residence. Rabin denied taking any field notes on this date.

¶ 75 Rabin had also conducted social media research but did not record such activities. He denied downloading any social media information, taking screenshots of websites, or taking notes on such research. However, he had a "recollection that [his associates and him] really found nothing." Rabin did not conduct any investigation into Melissa's financial records and found no evidence of Brent and Melissa's financial intermingling or "pooling their resources financially." Rabin did not have any independent information regarding Melissa's travels with Brent. Rabin

denied finding any evidence of the couple's intention to marry, such as through a wedding registration or purchasing a property together. Rabin did not take any photographs or conduct any surveillance for any "events" or holidays. However, he conducted surveillance on a birthday party, which he assumed to be Melissa's. He later stated that he did not know it was her birthday but was told it "could have been."

¶ 76    When asked if, based on his surveillance, Melissa and Brent spent less than 50% of their time together, Rabin responded that he did not know. Melissa's counsel confronted him with his deposition testimony taken on April 7, 2022, where he stated that he did not believe the two spent 50% of the week together. On the stand, Rabin subsequently stated that he did not believe "they spend more than 50 percent of their time together." When asked if he was unable to draw a conclusion about what happened over the course of a given evening based on his surveillance from the night before, he confirmed that he could not. He also could not draw any conclusions about any of the photographs Bobbe may have taken during his separate surveillance times.

¶ 77    On redirect examination, Rabin testified that he had been advised by David of potential dates that Melissa and Brent may be traveling together but otherwise had no independent knowledge of their trips. He did not typically prepare written reports in cohabitation cases. On recross-examination, Rabin clarified that he typically did not complete reports for his investigations but would do so in cohabitation matters upon the client's request, which was not done here.

¶ 78                                    v. Steven Bobbe

¶ 79    On direct examination, Bobbe testified that he was a licensed investigator employed by Rabin's agency and had conducted surveillance on Brent and Melissa. He "always" took

photographs or videos each time he conducted surveillance and, as such, confirmed various photos as his own on the stand.

¶ 80    On July 9, 2021, at 6:19 p.m., he observed Melissa and Brent enter a restaurant. He later observed Brent's car parked in Melissa's driveway that same day at about 8:03 p.m. Melissa's garage door was open, and her vehicle was parked inside. Bobbe conducted further surveillance on Melissa's residence during July and August 2021 and observed Brent's car parked in Melissa's driveway on the following dates: (a) July 16, 2021, at 7:11 p.m., in addition to the presence of other vehicles in her driveway and across the street; (b) July 23, 2021, at 6:40 p.m., in addition to Melissa's car and a young boy in front of the residence; (c) July 24, 2021, at 9:05 p.m.; (d) July 25, 2021, at 6:08 p.m.; and (e) August 22, 2021, at 5:44 a.m.

¶ 81    On August 21, 2021, at 6:10 a.m., Bobbe observed Brent's car in Melissa's driveway. At 8:29 a.m., he observed Brent getting in and out of his car and possibly driving away. Later that day, Bobbe also conducted surveillance on Brent inside a Home Depot. He observed Brent purchase what he believed to be a hose and another unconfirmed item. Bobbe followed Brent back to Melissa's house and observed him enter Melissa's driveway at 11:43 or 11:44 a.m. He watched Brent open his trunk, lift up a package, and carry various items into the house. He believed the items to be a watering hose or "windup." He did not observe other individuals at the house.

¶ 82    On cross-examination, Bobbe testified as follows. The agency would contact him with dates, times, and locations of his various surveillance jobs. Here, Rabin would either text or call him with such details, with specific instructions to conduct surveillance whenever Brent was at Melissa's home. Bobbe did not turn in timesheets and would orally communicate his hours to Rabin. He never reviewed any timesheets or wrote a written report documenting his surveillance

and only communicated to Rabin about the case over the phone or through text. Bobbe was compensated either in cash or with tangible items.

¶ 83    Bobbe denied conducting any investigation into any documents concerning the case and thus had no information as to whether Brent and Melissa intermingled their finances, traveled together, attended holidays or events together, intended on getting married, or owned any assets or property together. He had no evidence as to the types of items Brent installed in Melissa's home, but it was "obvious" what the items were.

¶ 84    Bobbe clarified that on August 21, 2021, he did not follow Brent to Home Depot, did not watch him at the checkout counter, and never saw him purchase an item. He did not take photos at Home Depot because Rabin had also been present and was taking photos. When asked if there were any instances in which he had surveilled Melissa and Brent without taking a photo, Bobbe then responded that he had taken photos at the Home Depot and turned them over to Rabin. He was unsure of what Rabin did with them after. When asked if the photos testified to by Rabin the day prior had been his or Rabin's, Bobbe responded that he did not know.

¶ 85    On redirect examination, Bobbe testified as follows. He and Rabin communicated mostly over the phone, but he was unsure in this matter if they discussed the case over text or phone. Bobbe was unaware and did not have knowledge as to whether his photos had been tendered to Melissa's counsel in discovery and was further unaware if all photos that he had provided to Rabin had been reviewed by the parties. He denied taking photos at "every single point" or "frame by frame" during the course of his surveillance. Bobbe denied seeing an exchange of money at Home Depot and only saw Brent leaving with some items.

¶ 86    On recross-examination, Bobbe testified that he was unsure if Brent had either purchased something at Home Depot or had picked the items up at the customer service counter. He did not

have any texts with Rabin during the time he conducted surveillance on Melissa and Brent. On redirect examination, Bobbe testified that he was unaware if Rabin had any texts between the two of them on his phone concerning the investigation.

¶ 87        *3. Melissa's Oral Motion for Directed Verdict and Subsequent Briefing*

¶ 88    Following the close of David's case-in-chief, Melissa's counsel made an oral motion for a directed finding pursuant to section 2-1110 of the Code of Civil Procedure (735 ILCS 5/2-1110 (West 2022)). Melissa argued that David had failed to establish a *prima facie* case for cohabitation and that the court should enter a directed finding denying David's petition.

¶ 89    David filed a brief in response. Preliminarily, he argued that Melissa's oral motion had been "legally deficient," as she had failed to provide any argument as to the deficiency of his proffered evidence, such as whether he had failed to establish the six factors for cohabitation under Illinois law pursuant to *In re Marriage of Sunday*, 354 Ill. App. 3d 184 (2004). Substantively, David contended that he had met his *prima facie* burden under section 2-1110 by presenting sufficient evidence that a *de facto* marriage existed between Melissa and Brent, as he had shown evidence regarding the length of the parties' relationship, the amount of time spent together, the nature of their shared activities, whether the two vacation together, the interrelation of their personal and financial affairs, and shared holidays.

¶ 90    Melissa filed a reply, arguing that David had failed to proffer evidence on every essential element required to establish a *de facto* marriage. Specifically, Melissa pointed out, David had only shown evidence of an intimate dating relationship and could not show evidence as to any financial entanglements between Melissa and Brent, such as through shared bank accounts, household expenses, or property. Thus, according to Melissa, pursuant to the analysis in *In re*

*Marriage of Miller*, 2015 IL App (2d) 140530, David could not prove that their relationship had a deeper level of commitment or intended permanence and partnership.

¶ 91                    *4. Trial Court Ruling on the Motion for Directed Finding*

¶ 92    On January 10, 2023, the trial court issued an oral ruling, which granted Melissa's motion and denied David's petition.[6] Preliminarily, the court stated that its analysis under section 2-1110 was "two-pronged," in which it first had to determine, as a matter of law, whether David had presented a *prima facie* case on his petition, meaning he had to present "some evidence" on "every element essential" to his case. The court observed that, *if* it found that David failed to present a *prima facie* case, it would have to grant Melissa's motion with a review of its decision being *de novo* on appeal. Conversely, the court continued, if it found that David did meet his *prima facie* burden, it would move to the second prong, which considered the totality of the evidence presented, including any evidence favorable to Melissa. The court noted that, unlike a motion for a directed verdict in a jury trial, where the court was required to view the evidence in the light most favorable to the plaintiff, here the court was solely required to weigh all the evidence, determine the witnesses' credibility, and draw reasonable inferences therefrom.

¶ 93    Next, the court stated that "[t]he ultimate question to be answered" was "whether an ex-spouse who is receiving maintenance has been cohabitating with a new partner on a resident[,] continuing[,] and conjugal basis" or, put another way, "whether the ex-spouse has entered into a *de facto* marriage." The court indicated that there was a difference between an "intimate dating relationship" and "a resident continuing conjugal relationship," with the "key" being whether "the parties have become financially intertwined." The court noted that it was David's burden to

---

[6]Due to the detail of the trial court's factual findings, we shall recite such findings within the analysis section of this order.

establish cohabitation based on several nonexhaustive factors, such as the length of the relationship, amount of time spent together, the nature of activities, the interrelation of personal and financial affairs,` and evidence of vacations and holidays spent together.

¶ 94     Ultimately, although the court noted that it found all the witnesses in the case to be credible, it did not find the existence of a *de facto* marriage, focusing specifically on Brent and Melissa's lack of intention to further their relationship, as well as the lack of evidence concerning intermingling of "marital resources." The court's oral ruling was later memorialized in a written order on January 11, 2023, which further provided that there was "no just reason for delaying enforcement or appeal" of its order in accordance with Illinois Supreme Court Rule 304(a) (eff. Mar. 8, 2016). On January 31, 2023, David filed a timely notice of appeal.

¶ 95     This appeal followed.

¶ 96                                   II. ANALYSIS

¶ 97                                   A. Jurisdiction

¶ 98     Although not raised by either party, it is our independent duty to assess our jurisdiction to review this appeal, which is only established when a party files a timely notice of appeal. *State Farm Fire & Casualty Co. v. John J. Rickhoff Sheet Metal Co.*, 394 Ill. App. 3d 548, 556 (2009). A notice of appeal generally may not be filed until the trial court has disposed of all claims. *John G. Phillips & Associates v. Brown*, 197 Ill. 2d 337, 341 (2001). "Put another way, appellate jurisdiction generally exists only to review final orders." *State Farm Fire & Casualty Co.*, 394 Ill. App. 3d at 556. A final order is one that "disposes of the rights of the parties, either upon the entire controversy or upon some definite and separate part thereof." (Internal quotation marks omitted.) *Treece v. Shawnee Community Unit School District No. 84*, 39 Ill. 2d 136, 139 (1968).

¶ 99   However, Rule 304(a) allows for the filing of a notice of appeal of a final judgment, even if all claims for relief in the pending matter have not yet been resolved. Ill. S. Ct. R. 304(a) (eff. Mar. 8, 2016). Specifically, the rule provides:

> "If multiple parties or *multiple claims for relief* are involved in an action, an appeal may be taken from a final judgment as to one or more but fewer than all of the parties or claims only if the trial court has made an express written finding that there is no just reason for delaying either enforcement or appeal or both. Such a finding may be made at the time of entry of the judgment or thereafter on the court's own motion or on motion of any party." (Emphasis added.) *Id.*

¶ 100   "Absent [a Rule 304(a) finding], if an order finally resolves one claim against one party, but other claims and/or other parties remain pending, an appeal from the final order must wait until the other matters have been resolved." *State Farm Fire & Casualty Co.*, 394 Ill. App. 3d at 556.

¶ 101   Here, the record reflects that, prior to the court's oral ruling dismissing David's petition, Melissa filed a "Verified Petition for Rule to Show Cause" based on David's alleged violation of an unrelated matter in accordance with the parties' MSA, specifically relating to David's failure to pay Melissa a portion of a property settlement delineated in section 9.2(b). This petition was filed on January 9, 2023. Immediately following the court's oral ruling, the parties stipulated to the court that the substantive matter underlying the request for the rule to show cause had been resolved, but "technically" the request was still pending. In response, the court ordered briefing on the matter. The court also indicated that it would add a Rule 304(a) finding to the order memorializing its oral ruling on David's petition, which formalized its dismissal.

¶ 102   We find that we have jurisdiction to review David's appeal. Although it appears that there was at least one matter pending before the court, the court's order expressly noted that, under Rule

304(a), there was no just reason to delay David's appeal regarding the dismissal of his petition. Further, the basis for the petition concerned matters separate from the issue of David's maintenance obligation. See *In re Marriage of Demaret*, 2012 IL App (1st) 111916, ¶ 38 (pending claim for attorney fees to defend against a child removal petition was a separate and distinct request from the petition itself and therefore did not bar appellate review of the lower court's ruling on removal petition).

¶ 103                                    B. The Act

¶ 104   Before we turn to the merits of the parties' arguments on appeal, we begin with a discussion of the governing statute, the Act, as it affects our determination of appellant's first contention on appeal, namely whether the trial court erred in finding that David had failed to establish a *prima facie* case of cohabitation.

¶ 105   The Act controls the modification or termination of a maintenance award. Generally, courts are empowered to determine whether a party is entitled to maintenance. 750 ILCS 5/504(a) (West 2020). However, the Act also allows for parties to "enter into an agreement containing provisions for disposition of any property owned by either of them," including "maintenance of either of them [or] support." *Id.* § 502(a). Any such agreement must be reduced to writing and approved by a court. *Id.* Further, "[t]he terms of the agreement, except those providing for the support and parental responsibility [for] allocation of children, are binding upon the court" unless the court finds the terms to be unconscionable. *Id.* § 502(b). Maintenance can be fixed-term, indefinite, or reviewable subject to other provisions of the Act. *Id.* § 504(b-4.5).

¶ 106   The Act further provides that any previous "order for maintenance may be modified or terminated only upon a showing of a substantial change in circumstances," which are delineated therein. *Id.* § 510(a-5). However, termination of maintenance, based on cohabitation, is addressed

specifically in section 510(c), where any "obligation to pay future maintenance is terminated upon the death of either party, or the remarriage of the party receiving maintenance, *or if the party receiving maintenance cohabits with another person on a resident, continuing conjugal basis.*" (Emphasis added.) *Id.* § 510(c). One's obligation to pay maintenance or unallocated maintenance is terminated by operation of law on the date that the maintenance recipient remarries or on the date the court finds cohabitation to have begun. *Id.* A maintenance payor may then be entitled to reimbursement for any maintenance paid from that date forward. *Id.*

¶ 107    Section 510(c) is not an attempt to control public morals. *In re Marriage of Edson*, 2023 IL App (1st) 230236, ¶ 109. Rather, the statute seeks to "remedy the inequity created when the recipient spouse becomes involved in a husband-wife relationship but does not formalize the relationship" in order to continue receiving maintenance from the ex-spouse. *Sunday*, 354 Ill. App. 3d at 189; see *Miller*, 2015 IL App (2d) 140530, ¶ 40 (" ' "Where the relationship has achieved a permanence sufficient for the trial court to conclude that it has become a substitute for marriage, equitable principles warrant a conclusion that the spouse has abandoned his or her rights to support from the prior marriage \*\*\*." ' " (quoting *In re Marriage of Weisbruch*, 304 Ill. App. 3d 99, 105 (1999), quoting *In re Marriage of Herzog*, 761 S.W.2d 267, 268 (Mo. Ct. App. 1988))).

¶ 108    C. Cohabitating on a Resident, Continuing Conjugal Basis or "De Facto" Marriage

¶ 109    The party moving to terminate maintenance must show that the recipient is engaged in a "resident, continuing conjugal relationship" as delineated within section 510(c), which has also been termed as "cohabiting with someone" or being in a "*de facto* marriage" with a third party. *Edson*, 2023 IL App (1st) 230236, ¶¶ 111-12; *Sunday*, 354 Ill. App. 3d at 188-89; see *In re Marriage of Roofe*, 122 Ill. App. 3d 56, 59 (1984) ("[C]ourts have construed 'cohabitation' to mean a *de facto* husband-wife relationship."); see also *In re Marriage of Clark*, 111 Ill. App. 3d

960, 961 (1983) (in interpreting the Act, "courts of this State have held that a *de facto* husband-wife relationship must be shown in order to demonstrate cohabitation"). "If the moving party meets their burden, the maintenance recipient must then demonstrate that he or she is not engaged in that type of relationship." *Edson*, 2023 IL App (1st) 230236, ¶ 111.

¶ 110   Whether the relationship rises to the level of a *de facto* marriage is generally a question of fact. *Id.* ¶ 112. As such, the Illinois Appellate Court has recently begun utilizing a nonexhaustive factor test to determine whether such a relationship exists, which is said to have "originated" from the Fourth District case of *In re Marriage of Herrin*, 262 Ill. App. 3d 573 (1994). See *Edson*, 2023 IL App (1st) 230236, ¶ 112; *Miller*, 2015 IL App (2d) 140530, ¶¶ 40, 47; *Sunday*, 354 Ill. App. 3d at 189. Such factors include "(1) its length; (2) the amount of time [the couple] spend[s] together; (3) the nature of the activities they engaged in; (4) the interrelation of their personal affairs; (5) their vacationing together; and (6) their spending holidays together." *Herrin*, 262 Ill. App. 3d at 577. These factors have seemingly been adopted, "without discussion, as though the factors were sufficient to encapsulate the totality of the circumstances in all cases." *Miller*, 2015 IL App (2d) 140530, ¶ 47; *Edson*, 2023 IL App (1st) 230236, ¶ 112.

¶ 111   We recently observed in *In re Marriage of Edson* that our supreme court has not adopted this six-factor analysis in any manner, "let alone adopted it as sufficient." (Internal quotation marks omitted.) *Edson*, 2023 IL App (1st) 230236, ¶ 113. Additionally, our courts have also questioned the saliency of various aspects of the test. *Id.*; *Miller*, 2015 IL App (2d) 140530, ¶ 48 ("A fair reading of *Herrin* leads us to the conclusion that, while helpful in most instances, the six-factor analysis was never intended to be used as *the* test to find a *de facto* marriage." (Emphasis in original.)). Such criticisms concern whether the *Herrin* factors sufficiently capture all aspects of a life partnership, as the test focuses more on the " 'emotional and social components of a

relationship[,] as opposed to practical and financial aspects that life partners share.' " *Edson*, 2023 IL App (1st) 230236, ¶ 113 (quoting *Miller*, 2015 IL App (2d) 140530, ¶ 48); see *Weisbruch*, 304 Ill. App. 3d at 104 ("[I]t is the financial implications of the relationship that are most relevant to determining the need for maintenance," with "[t]he most important factor [being] whether the cohabitation affects the receiving spouse's need for support."). The *Herrin* factors may also fail to appreciate a key emotional factor presumed to be present in any *de facto* marriage, which is " 'intended permanence and/or mutual commitment to the relationship.' " (Emphasis omitted.) *Edson*, 2023 IL App (1st) 230236, ¶ 113 (quoting *Miller*, 2015 IL App (2d) 140530, ¶ 48).

¶ 112   Further, "prior to the more formalized use of the six-factor *Herrin* test, many of our earlier appellate decisions placed much emphasis on whether the facts of each case expressly met the three statutory requirements of section 510(c)—namely, whether a cohabiting relationship was 'resident,' 'continuing,' and 'conjugal' in nature." *Id.* ¶ 116. "For instance, in discussing whether a 'conjugal' relationship must include sexual relations, our supreme court in [*In re Marriage of Sappington*, 106 Ill. 2d 456, 462-64 (1985),] stated that the term 'cohabitation' meant 'living or dwelling together,' while 'conjugal' is to be interpreted as '[o]f or belonging to marriage or the married state.' " *Id.*; see *In re Marriage of Sappington*, 106 Ill. 2d 456, 467-68 (1985). Indeed, many of our earlier decisions appeared to oscillate between declining to terminate or terminating maintenance based on whether the relationship is *either* conjugal, continuing, or resident. See *In re Marriage of Johnson*, 215 Ill. App. 3d 174, 180-82 (1991) (reversing trial court's finding of a conjugal, continuing relationship, where appellate court held that ex-wife was not a "resident" under the Act simply by occasionally staying at new partner's home); see also *In re Marriage of Frasco*, 265 Ill. App. 3d 171, 176-77 (1994) (even after partner moved out of shared home with

maintenance recipient and technically was not a "resident," the court still found evidence of *de facto* marriage).

¶ 113  Now, courts have begun to draw lines between "an intimate dating relationship" and a *de facto* marriage. See *Edson*, 2023 IL App (1st) 230236, ¶¶ 114-15; *Johnson*, 215 Ill. App. 3d at 180-81 (reversing termination of maintenance when, "[a]t most, the evidence may support a dating relationship"). For instance, an intimate dating relationship will show evidence of " 'companionship and exclusive intimacy,' " whereas a marriage-like relationship, which may also contain such characteristics, will also present " 'deeper level[s] of commitment' " and " 'intended permanence.' " *Edson*, 2023 IL App (1st) 230236, ¶ 114 (quoting *Miller*, 2015 IL App (2d) 140530, ¶ 61). Additionally, a marriage-like relationship will likely show, " 'unless *reasonably explained*, financial or material partnership.' " (Emphasis added.) *Id.* (quoting *Miller*, 2015 IL App (2d) 140350, ¶ 61). That financial or material partnership may be shown through evidence of a shared household, rather than overnight stays. See *In re Marriage of Bates*, 212 Ill. 2d 489, 524 (2004) (spending time together with "sporadic" overnight stays does not establish a husband-and-wife-like relationship where individuals did not live in the same residence, did not share finances, and did not take vacations together). In that same vein, however, our supreme court has also noted that a conjugal relationship may be found even when sexual relations have not occurred. See *Sappington*, 106 Ill. 2d at 467-68; *In re Marriage of Aspan*, 2021 IL App (3d) 190144, ¶ 15 ("Illinois courts no longer require 'proof of sexual conduct,' so long as the party seeking termination can establish 'facts which would lead a reasonable observer to believe that the individuals were [living as] husband and wife.' " (quoting *In re Marriage of Lambdin*, 245 Ill. App. 3d 797, 801 (1993))).

¶ 114   Thus, it appears that the body of law has shifted away from those pure statutory definitions and now focuses on whether a relationship is "husband-and-wife-like" in nature, *i.e.*, one of a *de facto* marriage, based on the totality of the circumstances. See *Sappington*, 106 Ill. 2d at 467; *Edson*, 2023 IL App (1st) 230236, ¶¶ 117, 184-85; *Miller*, 2015 IL App (2d) 140530, ¶ 2 (noting that "the *absence* of certain traditional components of a marital relationship, such as intended permanence and mutual commitment (speaking to the *continuing* and *conjugal* elements), a shared day-to-day existence (speaking to the *conjugal* and *residential* elements), and the shared use and maintenance of material resources (speaking to the *residential* element)" may be detrimental to a petition to terminate maintenance (emphases added and in original)). This establishes a reasonable compromise between the inevitable varying degrees of such relationships, because even if a relationship may have been short in duration or the couple may not live together at the time of trial, "it may nonetheless still bear the hallmarks of a *de facto* marriage." *Edson*, 2023 IL App (1st) 230236, ¶ 117.

¶ 115   Thus, a petition to terminate maintenance based on the recipient spouse's alleged conjugal cohabitation is assessed on its own unique facts and with deference to the trial court's primary position in weighing that evidence. *Id.* ¶ 118. We are also mindful that the *Herrin* factors were meant to be *nonexhaustive*. *Id.* Thus, although helpful, courts are cautioned to not approach each cohabitation case with a " 'checklist' " in mind, given that many of the six factors can still present themselves in an intimate dating relationship as well as in a *de facto* marriage. *Id.* (quoting *Miller*, 2015 IL App (2d) 140530, ¶ 68). Accordingly, with these principles and considerations in mind, we turn to the evidence in the record.

¶ 116                    D. Standard of Review on a Motion for Directed Finding

¶ 117   Generally, upon reviewing a trial court's ruling on a petition to terminate maintenance based on the existence of a *de facto* marriage, we will not disturb the court's decision unless it is against the manifest weight of the evidence. *Miller*, 2015 IL App (2d) 140530, ¶ 40. "A decision is against the manifest weight of the evidence if the opposite conclusion is clearly evident or if the decision is unreasonable, arbitrary, or not based on the evidence." *Id.* We also will not disturb a trial court's credibility determinations. *Id.* ¶ 41.

¶ 118   However, the procedural posture upon which this case comes to us concerns David's first contention on appeal. Specifically, David argues that the court's ruling emerged from the first stage of its directed verdict analysis, when it found that David failed to meet his *prima facie* burden in establishing cohabitation by not proffering evidence as to whether (a) Melissa and Brent were financially intertwined, (b) the two shared a day-to-day existence, and (c) the parties vacation together. David maintains that he proffered sufficient evidence on all the factors and thus met his burden. Further, David continues, in the event that we agree with him and find that the court should have assessed his petition under the second prong of the analysis, the trial court's overall decision to deny the petition was also against the manifest weight of the evidence.

¶ 119   As pointed out by David, Melissa does not appear to challenge his contention that the court improperly assessed his motion under the first prong of the directed finding analysis. Instead, she responds that the court "seemingly" grounded its ruling on the second prong, given that it stated that it had weighed all the evidence, determined the credibility of the witnesses and evidence therein, and drew reasonable inferences from both. Thus, Melissa agrees that a manifest weight of the evidence standard is appropriate in this appeal.

¶ 120 We turn to the applicable statute. Section 2-1110 of the Code of Civil Procedure (735 ILCS 5/2-1110 (West 2022)) governs the resolution of motions for directed verdicts in nonjury cases, providing:

"[A] defendant may, at the close of plaintiff's case, move for a finding or judgment in his or her favor. In ruling on the motion[,] the court shall weigh the evidence, considering the credibility of the witnesses and the weight and quality of the evidence. If the ruling on the motion is favorable to the defendant, a judgment dismissing the action shall be entered. If the ruling on the motion is adverse to the defendant, the defendant may proceed to adduce evidence in support of his or her defense, in which event the motion is waived."

¶ 121 The court's assessment of a motion for a directed finding is a two-pronged analysis. *People ex rel. Sherman v. Cryns*, 203 Ill. 2d 264, 275 (2003); *L.D.S., LLC v. Southern Cross Food, Ltd.*, 2017 IL App (1st) 163058, ¶ 33. First, the trial court must determine whether the plaintiff has presented a *prima facie* case as a matter of law. *Moles v. Illinois Farmers Insurance Co.*, 2023 IL App (1st) 220853, ¶ 16. To meet this burden, the plaintiff must proffer at least *some evidence* of *every element* of the underlying cause of action. *Id.*; *L.D.S., LLC*, 2017 IL App (1st) 163059, ¶ 33. If the plaintiff cannot meet that burden, the trial court must grant the motion and enter judgment for the defendant. *Moles*, 2023 IL App (1st) 220853, ¶ 16. Because this determination is a question of law, the trial court's ruling at this prong is reviewed *de novo*, meaning we perform the same analysis as the trial court. *L.D.S., LLC*, 2017 IL App (1st) 163059, ¶ 33; *Moles*, 2023 IL App (1st) 220853, ¶ 17.

¶ 122 Conversely, if the court finds that the plaintiff has met this burden, the trial court moves to the second step. *L.D.S., LLC*, 2017 IL App (1st) 163059, ¶ 34. There, the court considers the totality of the evidence presented and weighs the actual evidence, the credibility of the witnesses,

and otherwise reasonable inferences. *Moles*, 2023 IL App (1st) 220853, ¶ 17. Importantly, and in contrast to the standard employed by the trial court when ruling on similar motions in a jury trial, sometimes referred to as the "*Pedrick* standard" (see *Pedrick v. Peoria & Eastern R.R. Co.*, 37 Ill. 2d 494 (1967)), the court here "is *not* to view the evidence in the light most favorable to the plaintiff." (Emphasis added and internal quotation marks omitted.) *L.D.S., LLC*, 2017 IL App (1st) 163058, ¶ 34; see *In re Estate of Etherton*, 284 Ill. App. 3d 64, 68 (1996) ("[A]t the second stage[,] the trial court views the case 'in the same manner as it would had the defendant rested at the close of the plaintiff's case' [citation]."). As such, " '[t]his weighing process may result in the negation of some of the evidence presented by the plaintiff.' " *L.D.S., LLC*, 2017 IL App (1st) 163058, ¶ 34 (quoting *Sherman*, 203 Ill. 2d at 276).

¶ 123   Ultimately, in weighing all of the evidence and applying the applicable standard of proof for the underlying cause, the trial court must determine whether *sufficient evidence* remains to establish the plaintiff's *prima facie* case. *L.D.S., LLC*, 2017 IL App (1st) 163058, ¶ 34; see, *e.g.*, *Cuculich v. Thomson Consumer Electronics, Inc.*, 317 Ill. App. 3d 709, 717 (2000) (discussing that "sufficient" evidence is usually assessed by the preponderance of the evidence but, when underlying cause of action calls for a clear and convincing standard, the evidence must meet that higher burden). If sufficient evidence has been presented, the court should deny the defendant's motion and proceed with the trial. *L.D.S., LLC*, 2017 IL App (1st) 163058, ¶ 34. If the court determines otherwise, it should grant the defendant's motion and enter a judgment dismissing the action. *Id.* If the motion is granted at the second stage, we review the court's ruling pursuant to the manifest weight of the evidence standard. *Moles*, 2023 IL App (1st) 220853, ¶ 17.

¶ 124   Our review of the record indicates that the manifest weight of the evidence standard is the correct standard of review. David makes much of one sentence in the court's ruling, where the

court mentions that an appellate court review of its ruling at the first stage would be *de novo*. However, David misperceives the court's ruling. A full contextual review indicates that the court was simply stating what standard of review would be applied at stage one of the section 2-1110 analysis, *if* it found that David did not meet his *prima facie* burden. However, the court never indicated that this was its ruling, and the rest of its analysis shows that the court assessed the motion under the second prong. Specifically, the court discussed the evidence in the case, including that it found all the witnesses to be credible. The court even noted that the matter was "a difficult case," that it had to "read" and "reread the evidence" and stipulations, and that it ultimately had to "weigh the evidence that was presented." Thus, although the court never specifically said the words "sufficient evidence," it is clear that the trial court found that David had met his burden in the first part of the analysis and thus assessed David's petition under the second prong.

¶ 125   Having articulated the proper standard of review, we now assess whether David failed to meet his burden on his petition. For the reasons stated below, we agree with the trial court that David failed to establish cohabitation, and thus we do not find the trial court's dismissal of the petition to be against the manifest weight of the evidence.

¶ 126                    E. Court's Overall Ruling on David's Petition

¶ 127   Both David and Melissa agree that the six-factor *Herrin* test is the proper mode of assessment for the issue on appeal.[7] Melissa also concedes that many of the factors "at first glance seem to favor David's position," but when examining the evidence more closely, Melissa

---

[7]In his reply brief, David urges the court to strike portions of Melissa's statement of facts because, according to him, that section violates Illinois Supreme Court Rule 341(h)(6) (eff. Oct. 1, 2020), as it "contains legal conclusions and arguments, omits facts contrary to Melissa's position, and grossly mischaracterizes the evidence" presented at trial. Following our review of the record, we find this contention meritless.

maintains that her and Brent's relationship does not equate to anything more than an intimate dating relationship.[8]

¶ 128                    1. *The Length of the Relationship*

¶ 129   David argues that Melissa and Brent have been in an exclusive dating relationship since at least August 2014 and, following a brief estrangement, the two recommenced their exclusive, monogamous, and sexual relationship in January 2018. Melissa responds that she and Brent have been in an exclusive dating relationship since January 2018. In its ruling, the trial court observed, by stipulation and "by all definitions," the parties were in an intimate dating relationship that was sexual in nature. The court further noted that, although it was both Brent and Melissa's testimony that their relationship had "extended over a period of time," both also had no plans for marriage or any further commitment to each other, which it found to be credible.

¶ 130   The record reflects that, at least as of January 2018, Melissa and Brent had been involved in a monogamous dating relationship that was sexual in nature. Thus, at the time of trial, the two had been together for at least four years. There is also evidence that their relationship began earlier, specifically around August 2014, although both parties were still married to other individuals at the time and Brent expressly noted that he considered the relationship to be exclusive after January 2018. Although the trial court did not make an explicit finding as to whether the length of the relationship equated to a finding of a *de facto* marriage, we are aware that courts have found the existence of one based on similar timelines and characteristics, particularly when viewed in

---

[8]We observe that in Melissa's brief she only expressly makes an argument for what she deems as the most "critical" of the six *Herrin* factors, namely the "interrelation of personal affairs" factor, and any other discussion of the evidence conflates the remaining six factors. Although it is not Melissa's burden on appeal, it is also not this court's job to parse out the finer points of a party's argument to ensure that the party has not otherwise forfeited those contentions on appeal. To the extent we can identify that Melissa has made an implicit argument to the other remaining factors, we will acknowledge them. Otherwise, points not argued are forfeited. See Ill. S. Ct. R. 341(h)(7) (eff. Oct. 1, 2020).

conjunction with other pillars of the relationship. See, *e.g.*, *Edson*, 2023 IL App (1st) 230236, ¶ 125 (even with six-month separation, overall length of relationship of 4.5 years could suggest evidence of a *de facto* marriage); *In re Marriage of Walther*, 2018 IL App (3d) 170289, ¶ 27 (appearance of *de facto* marriage based on at least 2 years' involvement and 11 months' exclusivity); *In re Marriage of Susan*, 367 Ill. App. 3d 926, 930 (2006) (finding of *de facto* marriage where couple had been together for three years); *In re Marriage of Snow*, 322 Ill. App. 3d 953, 956 (2001) (continual, conjugal relationship where couple was together for 1.5 years, even after third party moved out of the residence); *Herrin*, 262 Ill. App. 3d at 577 (couple together for 2.5 years and had sexual relations). Accordingly, this factor weighs in favor of a *de facto* marriage. However, as our further analysis will demonstrate, the length of the couple's relationship carries less weight based on other relevant factors.

¶ 131                    2. *The Amount of Time Spent Together*

¶ 132   David argues that Melissa and Brent spend a "majority" of their time together during the week, even when Ian was present, as well as a great deal of time on the weekends when Ian was with David. Specifically, David asserts that Brent spent more than "40 overnights" at Melissa's former residence from 2019 to 2021, including Brent's overnight stay when he cared for Melissa following her hip surgery. Melissa acknowledges that she and Brent spend "a few" overnight weekends together a month when Ian is with David and that Brent shares meals with Melissa "a couple of times per month."

¶ 133   We turn to the court's findings. Although the court found evidence that the two had spent time together, it otherwise found that Melissa and Brent did not have a "shared day-to-day existence" and essentially "operate[d] as two separate households with shared time between them." After reviewing the record, we also agree. We acknowledge that the amount of time spent together

will ultimately involve the assessment of other *Herrin* factors, such as the nature of the couple's shared activities or the holidays or vacations the couple have spent together. See *Edson*, 2023 IL App (1st) 230236, ¶ 131. It is true that Melissa and Brent have traveled together since 2018, including with Melissa's children, which we will discuss more extensively in the corresponding *Herrin* factor. However, it appears that Brent and Melissa make conscious efforts to spend time together *without* Melissa's minor child present as often as possible, given that it was their testimony that they try to see each other on the weekend when Ian is with David, which according to David, was about "40" overnights. Given the fact that this number encompassed a time period between 2019 and 2021, we do not find 40 overnights to be excessive. On this point, however, we note David's testimony that in July 2021 Ian was with Melissa for three consecutive weekends, meaning that either Brent was not with Melissa during one of the weekends or was present while Ian was there, thus indicating that the total number may not be so accurate. Additionally, we observe some inconsistencies between Brent's and Melissa's testimony regarding how many nights he spent with her following her hip surgery.

¶ 134    Nevertheless, we believe the record actually demonstrates a potential *decrease* in time spent together. For instance, both Brent and Melissa testified that Melissa's new residence in Hoffman Estates has actually increased the distance between the couple's homes, albeit not by a much greater measurement. However, it was also Brent's testimony that, since March 2022, he has traveled for work at least three to five days a week and likely only saw Melissa on the weekends, indicating that he is not with her often during the weekdays. See *id.* ¶ 130 (no relationship where potential cohabiting partner traveled for work during the weekdays and could only see maintenance recipient on every other weekend). It was also Brent's testimony that he does not pack an overnight bag when he stays over because he would return home right after he woke up, thus indicating that

he does not loiter at Melissa's home after spending the night. See *id.* ¶ 137 (partner did not store belongings at maintenance recipient's home). Further, Melissa testified that, even when on vacation, the two had never spent more than six days in a row with each other, which appears to be the time they traveled to Lake of the Ozarks. Finally, David's investigator testified that he did not believe the two spent more than 50% of their time together based on his surveillance of the couple during a three-or-four-month period. Notably, his investigation was conducted in 2021 and thus prior to Brent's increased work travel.

¶ 135    There is also no indication that the lack of time spent together was based on any awareness of how David's petition may affect Melissa's maintenance payments, as the two testified that they did not have conversations beyond what "cohabitation meant," which the court found to be credible. See *Miller*, 2015 IL App (2d) 140530, ¶¶ 65-66 (courts may consider a party's "awareness of the legal consequences of cohabitation," such as where parties who are already in a "married" state alter their behavior to hide the true nature of their relationship). Thus, it is reasonable to infer that Brent and Melissa often do not spend time with each other during the week and therefore do not spend a significant amount of time together overall. Compare *Edson*, 2023 IL App (1st) 230236, ¶ 130 (no relationship where couple spent significant amount of time together only when able to), with *Herrin*, 262 Ill. App. 3d at 577 (finding of a *de facto* marriage where couple saw each other every day and spent most evenings together), *Aspan*, 2021 IL App (3d) 190144, ¶¶ 6, 20 (finding of *de facto* marriage where couple lived together), *Walther*, 2018 IL App (3d) 170289 ¶¶ 27-28, 33 (finding of *de facto* marriage where couple were together on a daily basis), and *Susan*, 367 Ill. App. 3d at 930 (finding of *de facto* marriage where couple spent nearly every night together during relationship); see *Sunday*, 354 Ill. App. 3d at 190-91 (evidence of

frequent overnight stays was not dispositive for determining whether a *de facto* relationship exists).

¶ 136   Accordingly, we agree with the trial court that the amount of time Melissa and Brent spend together also does not necessarily suggest evidence of a *de facto* marriage.

¶ 137                                    3. *The Nature of the Activities Engaged in*

¶ 138   David argues that the nature of Melissa and Brent's shared activities also suggests evidence of a *de facto* marriage. David points out that Brent was present during Melissa's inspection of her new residence and has assisted her at both her former and new residence, during her move, and following her surgery in 2019. He further notes that it was Melissa's testimony that she anticipated Brent to assist her with renovations at her new home. Additionally, David posits, the two have "fully integrated" their lives together as well as with their friends and family, as the evidence showed that Melissa and Brent have dined out or cooked on their own or with family, that they have a shared friend group, and that various members of each other's families have been present for birthday parties and other gatherings at Melissa's home with Brent there.

¶ 139   Melissa admits that Brent helps her around the house "from time to time," which included installing a garbage disposal, help with a closet, and seasonal yard work. Nevertheless, Melissa maintains that "some menial projects a few times a year are not comparable to a husband and wife dividing up daily household chores such as laundry, dishes, scrubbing toilets, taking out the weekly garbage, and cutting the grass," which would otherwise be demonstrative of a marital relationship.

¶ 140   The court did not make an explicit finding on this factor but acknowledged that the evidence showed that Brent assisted Melissa with repairing household items and had been present during an inspection prior to the purchase of her current residence. The court also found that the parties had exchanged "nominal" gifts during the course of their relationship and traveled together

from time to time. Additionally, the court observed, Melissa and Brent have socialized together with other family members or third parties. However, the court also noted that the parties did not share a residence and thus did not have shared housing resources or day-to-day existence, which included neither of them sharing a key to each other's homes.

¶ 141   After review of the record, we agree that this factor is a close call. First, socializing and eating together either in the home or in public have been found to be characteristic of *de facto* marriages. See *Edson*, 2023 IL App (1st) 230236, ¶ 139 (evidence of *de facto* marriage where couple went to dinner on their own or with friends and family); *Herrin*, 262 Ill. App. 3d at 577 (finding of *de facto* marriage where there was evidence of eating together at maintenance recipient's home); *Sappington*, 106 Ill. 2d at 465-66 (socializing together indicative of *de facto* marriage); *In re Marriage of Arvin*, 184 Ill. App. 3d 644, 647, 650 (1989) (no *de facto* marriage where couple only occasionally went out socially together); *Snow*, 322 Ill. App. 3d at 956 (*de facto* marriage where couple socialized together frequently and engaged in "dating activities" such as dinners, movies, and drinks); *Frasco*, 265 Ill. App. 3d at 176 (finding of *de facto* marriage where couple took meals together); *In re Marriage of Nolen*, 200 Ill. App. 3d 1072, 1075-76 (1990) (no finding of *de facto* marriage where pair infrequently socialized). Both Melissa and Brent testified that the two eat out together on the weekends and would also cook or eat with each other at each other's residences, although this would likely occur at Melissa's home rather than Brent's. Additionally, the two have entertained guests, including their mutual friend group, at Melissa's home, where Brent would cook on the grill and assist Melissa with party preparation, although he denied that he had "co-hosted" the event. There was also testimony that the two have shared expenses for meals, although Melissa testified that she often felt uncomfortable allowing Brent to cover her expenses in that regard.

¶ 142 However, we have also found evidence of a *de facto* marriage where the record demonstrates *shared* household chores, ranging from laundry to cooking to maintenance work. See *In re Marriage of Toole*, 273 Ill. App. 3d 607, 612 (1995) (sharing of chores may be evidence of *de facto* relationship); *Edson*, 2023 IL App (1st) 230236, ¶ 136 (partner assisted maintenance recipient with chores and repairs around the home); *Miller*, 2015 IL App (2d) 140530, ¶¶ 44, 69 (no *de facto* marriage where the parties did not share a household or perform household duties together); *Lambdin*, 245 Ill. App. 3d at 804 (no *de facto* marriage where maintenance recipient did not do her partner's laundry); *Arvin*, 184 Ill. App. 3d at 650 (no *de facto* marriage where maintenance recipient did not do laundry); *Snow*, 322 Ill. App. 3d at 956 (*de facto* marriage where couple split chores); *Frasco*, 265 Ill. App. 3d at 176 (finding of *de facto* marriage where relationship was akin to husband and wife, in that maintenance recipient acted as homemaker and partner did maintenance and yard work); *Walther*, 2018 IL App (3d) 170289, ¶¶ 28-29 (*de facto* marriage where maintenance recipient did household chores and prepped meals); *Roofe*, 122 Ill. App. 3d at 59-60 (maintenance recipient cooked meals at partner's home); *In re Marriage of Bramson*, 83 Ill. App. 3d 657, 663 (1980) (no *de facto* marriage even with shared chores); *Schoenhard v. Schoenhard*, 74 Ill. App. 3d 296, 301 (1979) (no *de facto* marriage where maintenance recipient lived with another man half the time and lived with her parents the other half, even though she performed chores for him and his children).

¶ 143 Here, as noted by the trial court, there was evidence of Brent assisting Melissa with chores and home improvement projects, which could be reasonably expected given Brent's professional work experience. Indeed, Brent even installed a garbage disposal in Melissa's home, knowing that she would not be there when he did it. However, there was no evidence of Melissa reciprocating such activities at Brent's apartment, other than helping him move from one unit to the next while

his previous residence was being remodeled. There is also no evidence regarding any shared expectations that Brent *should* help out or that Melissa was reliant on him to help her with such projects. Finally, there was also no evidence of Brent taking out the garbage, doing the laundry, or other everyday household chores one would expect a partner to do in a marital-like relationship.

¶ 144    Next, although the record shows that Brent has been alone at Melissa's home, there is no indication that he has free access to her residence. See *Sappington*, 106 Ill. 2d at 460 (partner had free access to maintenance recipient's home); *Walther*, 2018 IL App (3d) 170289, ¶ 29 (maintenance recipient had "unfettered access" to partner's home, even without a key). Both testified that they do not have keys to each other's homes. Although Brent had access to Melissa's garage, he could not otherwise enter her home unless the inner garage door was unlocked or she was already home. Compare *Edson*, 2023 IL App (1st) 230236, ¶ 141 (partner only briefly had access to home and now could only enter when maintenance recipient left door unlocked), with *Sunday*, 354 Ill. App. 3d at 188 (no *de facto* marriage, even where couple shared keys to each other's home). Similarly, Melissa solely utilized a key to Brent's house for a few hours while her former residence was undergoing an inspection. Although Brent admitted that there were likely other times he may have been in Melissa's home alone, the only two identifiable instances other than the garbage disposal installation included times where Melissa asked him to do so, such as watching Ian during a school or personal event. Further, neither testified that they had access to or had used each other's vehicles. See *Herrin*, 262 Ill. App. 3d at 577 (*de facto* marriage found where partner used maintenance recipient's car 90% of the time); *Sunday*, 354 Ill. App. 3d at 188 (no *de facto* marriage even when couple shared keys to each other's vehicles).

¶ 145    There is evidence that the two spend time with members of both their families, which we discuss more extensively in consideration of the "interrelation of personal affairs" factor. See

*Walther*, 2018 IL App (3d) 170289, ¶¶ 14, 29-30 (finding of *de facto* marriage where maintenance recipient maintained a good relationship with partner's daughter and engaged in multiple family activities); *Roofe*, 122 Ill. App. 3d at 60 (finding of *de facto* marriage where maintenance recipient's partner provided supervision and guidance to her daughter). The two have also held themselves out as a couple on social media and in each other's homes by sharing pictures of each other. See *Edson*, 2023 IL App (1st) 230236, ¶ 136. Melissa and Brent have also shared a bedroom at her house, and although it was not clear that they had also done so on overnight vacations, it is implied that they have, which may point towards evidence of a *de facto* marriage. *Id.* ¶ 143 (couple shared bedroom at maintenance recipient's home and on vacation); *In re Support of Halford*, 70 Ill. App. 3d 609, 614 (1979); *Walther*, 2018 IL App (3d) 170289, ¶¶ 27-30; *Roofe*, 122 Ill. App. 3d at 60; *In re Marriage of Caradonna*, 197 Ill. App. 3d 155, 159-60 (1990). Finally, the two have also traveled together, both on their own and with Melissa's children, which will be further discussed in the factor concerning vacation and travel.

¶ 146    Accordingly, on balance, we find this factor to slightly favor a finding of a *de facto* marriage. It is clear that the couple is involved in each other's personal and social lives. Additionally, although the two do not share daily household chores, Brent has contributed time and effort to other routine chores, such as landscaping and appliance maintenance, as well as assisting with larger-scale projects. We are mindful, however, of the court's comment concerning the couple's relatively separate existences, which we will discuss further in the factor concerning the interrelation of personal affairs below.

¶ 147                                    4. *The Interrelation of Personal Affairs*

¶ 148    David argues that Brent and Melissa share expenses for vacations, spend money on gifts for each other and their children, and freely exchange cash between themselves since at least

January 1, 2020. David further notes that Melissa failed to provide such evidence of these transactions during the litigation.

¶ 149    Melissa responds that David cannot demonstrate the couple's interrelation of their personal affairs, which, according to her, "arguably encompasses the more practical components of a marriage-like relationship." Melissa contends that she and Brent do not commingle their finances, each maintains their own household and financial affairs, the two do not share joint property or financial accounts, they have not made each other their emergency contact or life insurance policy beneficiary, and the two are not engaged and do not intend to become married. Melissa admits that the two have shared expenses for vacations and purchased gifts for each other, but she points out, as in *Miller*, many of these activities are simply normal facets of life for any other dating couple.

¶ 150    As discussed above, the trial court placed much emphasis on this factor, where it noted that a couple's financial entanglement was the only factor "that addresse[d] these more practical aspects to determine whether a *de facto* marriage exists." In this regard, the court found that the parties maintained separate households and did not otherwise share housing resources or a day-to-day existence, although it acknowledged that there was evidence of Brent assisting with some household duties from time to time. As such, the court reasoned, the couple "operate[d] as two separate households with shared time between them."

¶ 151    The court also did not find any evidence as to the couple's "partnership approach to the acquisition, use, and preservation of marital resources," which, in addition to emotional companionship and intimacy, would demonstrate a "deeper level of commitment with an intended permanence or a financial or material partnership which would most likely come from a form of a shared household." The court pointed to the lack of "financial intertwining" between the two, as shown by a lack of shared financial accounts or any evidence of Brent paying for Melissa's bills

or expenses. The court acknowledged that the two sometimes shared travel expenses but found that this was "not equivalent to the intertwining of finances." The court noted that there was no evidence of either naming each other as their healthcare power of attorney, emergency contact, beneficiary on life insurance policies, or other roles involved in estate planning. Finally, the court observed that neither party held a key to each other's homes, thus indicating a lack of free access at each other's residences.

¶ 152    To begin, we emphasize the purpose of the fourth factor, which is distinct from analyzing a recipient's financial needs. Instead, the fourth factor "evaluates 'not whether the new *de facto* spouse financially supports the recipient but, rather, whether their personal affairs, including financial matters, are commingled as those of a married couple would typically be.' " *Edson*, 2023 IL App (1st) 230236, ¶ 154 (quoting *Susan*, 367 Ill. App. 3d at 931); see *Frasco*, 265 Ill. App. 3d at 177-78. Thus, courts are to consider all aspects of the couple's life together, including financial, that might imply a husband-and-wife-like relationship.

¶ 153    As noted prior, Melissa and Brent do not live together, and Brent appears to be the only one who stays overnight at the other's home. See *Edson*, 2023 IL App (1st) 230236, ¶ 155 (no relationship where couple did not live together and only one partner stayed overnight at the other's home). Brent also maintains his own lease agreement, albeit it being month-to-month at this time; however, the purpose for doing so was the renovation of his apartment complex by its owners, which the court found to be credible. See *id.* ¶¶ 69, 164 (no evidence of intermingling where partner maintained separate residence with no evidence of abandonment). However, we acknowledge that a couple can still be found to cohabit even if they maintain separate households. See *Susan*, 367 Ill. App. 3d at 927-28, 930; *Herrin*, 262 Ill. App. 3d at 577-78. Additionally, there is also evidence that Brent cared for Melissa during her hip surgery recovery, thus suggesting a

level of intimacy between the couple. Thus, the trial court's initial determination that Melissa and Brent maintain separate households is not necessarily dispositive of their financial and personal affairs.

¶ 154    Nevertheless, we agree with the trial court that the rest of the evidence demonstrates the couple's lack of financial and commercial relationship. The body of law assessing a couple's financial relationship within the cohabitation analysis is growing and extensive. See *Edson*, 2023 IL App (1st) 230236, ¶ 156 (collecting cases regarding the importance of the economic aspects in marriage in assessing the existence of a conjugal relationship). First, the record demonstrates that Melissa and Brent do not share any joint financial accounts of any kind, with Melissa even being unaware as to where Brent holds a bank account. See *id.* ¶ 152 (no *de facto* marriage where there was no evidence of shared bank accounts or credit cards); *Lambdin*, 245 Ill. App. 3d at 804 (no *de facto* marriage where parties did not share real estate, personal property, or bank accounts); *Caradonna*, 197 Ill. App. 3d at 160 (no *de facto* marriage where maintenance recipient paid her own expenses, shared no personal accounts with new partner, and did not commingle funds); *Toole*, 273 Ill. App. 3d at 612 (*de facto* marriage found where parties shared bank and credit accounts).

¶ 155    We acknowledge that there was shared testimony that Melissa and Brent exchange cash between them for dinner or travel expenses, as well as him possibly purchasing items for her and then later being reimbursed. The couple has also shared expenses by paying for her sister's birthday in the past year, as well as hotel stays and airplane tickets, which may not be as "nominal" as characterized by Melissa or the court. See *Johnson*, 215 Ill. App. 3d at 181-82 (no *de facto* marriage where parties did not share expenses and third party did not take on maintenance recipient's other expenses). However, there is no indication that the two otherwise commingle

funds or take out loans for one another, and Melissa also expressly testified that she does not think Brent should be responsible for her dinner expenses. There is also no indication that Brent contributes to Melissa's mortgage expenses. See *Herrin*, 262 Ill. App. 3d at 577 (conjugal relationship found where partner borrowed money from maintenance recipient and maintenance recipient took out loans for partner in order to pay for a computer and a car and to help pay partner's child support obligations); *Walther*, 2018 IL App (3d) 170289, ¶¶ 28-29 (*de facto* marriage found where maintenance recipient cashed checks for her partner's business); *Caradonna*, 197 Ill. App. 3d at 160 (no *de facto* marriage where maintenance recipient paid her own expenses, shared no personal accounts with new partner, and did not commingle funds).

¶ 156 Further, beyond bank accounts, our courts have consistently elevated the gravity of this factor, indicating that some kind of financial entanglement will demonstrate deeper levels of commitment, intended permanence, and financial and material partnership. *Miller*, 2015 IL App (2d) 140530, ¶ 61. Such characteristics of permanence can include plans to be together permanently, retiring with a new partner, designating the new partner as one's healthcare power of attorney, or naming a partner as a beneficiary in estate planning or life insurance policy. *Edson*, 2023 IL App (1st) 230236, ¶ 160 (citing *Miller*, 2015 IL App (2d) 140530, ¶ 61). Thus, a *de facto* marriage may be found where there is *formal* integration of the new relationship into future endeavors. See *id.* ¶¶ 71, 152 (no finding of relationship where parties were not each other's respective beneficiaries on any financial accounts, including life insurance policy); *Weisbruch*, 304 Ill. App. 3d at 108 (finding of *de facto* marriage where third party was named as beneficiary on maintenance recipient's will, deferred compensation and retirement plan, and life insurance policies); see also *Bramson*, 83 Ill. App. 3d at 663 (no *de facto* marriage where third party received mail at another address and had identification cards with multiple addresses on them); *Sappington*,

106 Ill. 2d at 460 (third party had the newspaper delivered to the maintenance recipient's household). Here, although it is true that Brent helped care for Melissa after her surgery, neither has named the other as an emergency contact or as a beneficiary on any life insurance policy, and although neither has a will or trust, both do not intend to name each other as recipients in any manner. They do not share a joint membership of any kind. Brent is not on the title to Melissa's residence, and there is no evidence that she cosigned his current lease. There is evidence indicating that Brent has a low credit score, which he admitted could have an impact on whether he *could* be listed as an owner of Melissa's home, but he further testified that he had no intention of buying a home at this time.

¶ 157 Further, the occasional payment of a bill or utility, joint loan, or even one shared nonfinancial account has been insufficient to rise to a *de facto* marriage against the other circumstances of the relationship. See *Sunday*, 354 Ill. App. 3d at 191 (no *de facto* marriage where parties did not commingle funds and did not pay for each other's expenses, but third party would occasionally pay for food and gas when he used maintenance recipient's resources); *Arvin*, 184 Ill. App. 3d at 649-50 (payment of oil bill insufficient to find *de facto* marriage where no other household expenses were shared, no joint checking account, and no other commingling of funds); *Miller*, 2015 IL App (2d) 140530, ¶¶ 62-63 (parties shared a joint golf membership, but no *de facto* marriage where parties otherwise did not commingle finances and did not share household duties); *In re Marriage of Leming*, 227 Ill. App. 3d 154, 158, 161 (1992) (although maintenance recipient paid utilities and rent, couple otherwise did not commingle funds and maintained separate expenses); *Schoenhard*, 74 Ill. App. 3d at 301 (no *de facto* marriage where, despite new partner loaning maintenance recipient money, she otherwise paid her own expenses); *Edson*, 2023 IL App (1st) 230236, ¶ 152 (no *de facto* marriage found, even where partner purchased washer and dryer

on behalf of maintenance recipient, who repaid the loan within a few months, and partner utilized professional expertise to complete major household renovations). Here, there is evidence that Brent may have paid for groceries a handful of times and may have purchased items on her behalf, but there was no indication that he did so on a daily and expected basis.

¶ 158   In addition to not financially assisting Melissa with her bills, utilities, and other household expenses, Brent has also maintained his own residence. Compare *Edson*, 2023 IL App (1st) 230236, ¶ 164, with *Roofe*, 122 Ill. App. 3d at 59 (*de facto* marriage found where maintenance recipient kept her initial residence but rented it out to her daughter who took out utilities in her name and moved her furniture into her partner's residence and contributed to half the mortgage), and *Herrin*, 262 Ill. App. 3d at 575 (noting that third party owned another residence for four years, but the home did not have gas, water, or heat). We note that it was Steven Bobbe's testimony that he attempted to serve a subpoena to Brent at Melissa's residence, despite his knowledge that the two had separate homes, and it is also not clear whether the subpoena was actually successfully delivered to him. *Cf. Edson*, 2023 IL App (1st) 230236, ¶¶ 150, 157 (no *de facto* marriage where partner did not receive mail at maintenance recipient's home). Nonetheless, the record shows that, rather than move in with Melissa while his last apartment unit was being renovated, Brent chose to move into another unit. Brent also testified that, although his current lease is month-to-month, he once held a yearly lease in the same complex and intends to sign a similar contract whenever offered by his landlords. Finally, both Brent and Melissa have also testified that his apartment has running water, electricity, and gas. See *Sunday*, 354 Ill. App. 3d at 190 (no evidence of partner's implicit abandonment of residence to live with partner). The two also testified that they do not intend to buy any property together, although we acknowledge that it was also Brent's testimony that his ability to do so may be limited by a low credit score.

¶ 159   Finally, and although based more on the court's assessment of their credibility rather than any other evidence, both Brent and Melissa testified that they are not interested in marriage at this time and plan to keep their relationship as is. See *Edson*, 2023 IL App (1st) 230236, ¶ 138 (no *de facto* marriage where maintenance recipient did not express a desire for marriage, no exchange of rings, and couple did not refer to each other as husband or wife); *Miller*, 2015 IL App (2d) 140530, ¶ 67 (no finding of *de facto* marriage where the parties had discussed marriage but maintenance recipient did not want it and no other evidence demonstrated a desire to manifest a similar commitment). Although there is a stipulation in the record that Brent purchased something from Tiffany & Co. for Melissa at some point in their relationship, the cost of the unknown item was low in comparison to the cost of an engagement ring, and ultimately, again, the court found both parties to be credible on this point. We also believe the manner in which the two have presented themselves as a couple is relevant. Although the record shows that Brent has sometimes cared for Ian, it appears that he only steps in when asked. There is no evidence that either Brent or Melissa's children view Brent's role as anything other than Melissa's boyfriend, let alone as a stepfather. This is further corroborated by Melissa's testimony that Brent would not be attending Lea's graduation in Missouri because she did not think it was "necessary," even if they were dating, as well as the fact that Melissa did not plan to invite Brent to Thanksgiving because her children would be present.

¶ 160   As such, on balance, we do not find error in the trial court's conclusion regarding Melissa and Brent's personal and financial affairs. Although it acknowledged the length of the relationship, the court found credible that both Melissa and Brent had no intention of furthering or committing to their relationship beyond its current status. Additionally, although there is clearly some degree of social and emotional intimacy between the two, there is no showing of intended permanence or

a manifestation of deeper commitment on either individual's part. Accordingly, we also do not find any sufficient evidence of the couple's interrelated personal or financial affairs that would suggest anything more than an intimate relationship.

¶ 161                     5. *Whether They Vacation Together*

¶ 162   David argues that, during the period of January 2020 and March 2021, Melissa and Brent traveled together on at least nine trips, some that included Ian, and further posits that all of Melissa's overnight trips in 2020 were with Brent. Melissa admits that she and Brent have taken trips together and shared in such costs.

¶ 163   On this factor, the court recognized that the evidence showed that Melissa and Brent have traveled together "from time to time." Nevertheless, the court cautioned that traveling or vacationing together "d[oes] not in and of itself equate with a *de facto* marriage." However, case law suggests that evidence of *multiple* vacations taken together may lean towards the finding of a *de facto* marital relationship, even when it includes business trips. See *In re Marriage of Andres*, 2021 IL App (2d) 191146, ¶¶ 15, 22 (trial court found evidence of cohabitation where maintenance recipient and third party traveled together for business and leisure); *Herrin*, 262 Ill. App. 3d at 577 (*de facto* marriage where parties took vacations together); *Sunday*, 354 Ill. App. 3d at 192-93 (reversing trial court's finding of a conjugal relationship where, among other bases, evidence showed that the parties did not take vacations together); *Lambdin*, 245 Ill. App. 3d at 804 (no *de facto* marriage where parties did not take vacations together); *Sappington*, 106 Ill. 2d at 466 (evidence of vacations together established sufficient relationship); *Aspan*, 2021 IL App (3d) 190144, ¶¶ 10-11, 18, 20 (same); *Frasco*, 265 Ill. App. 3d at 176 (same); *Walther*, 2018 IL App (3d) 170289, ¶¶ 29, 31 (*de facto* marriage established where evidence of short trips were taken together); *Susan*, 367 Ill. App. 3d at 930 (evidence of many trips established a *de facto* marriage);

*Nolen*, 200 Ill. App. 3d at 1075 (no *de facto* marriage where parties did not travel together unless by necessity). But see *Rosche v. Rosche*, 163 Ill. App. 3d 308, 313-14 (1987) (no *de facto* marriage, even though parties took trips together).

¶ 164 Here, the parties stipulated to the following vacations taken by Brent and Melissa: (1) Jacksonville, Florida, over Thanksgiving weekend 2019 to visit Brent's mother and stepfather; (2) Lake of the Ozarks and Stark Caverns, Missouri, with Ian from June 29 to July 6, 2020, to visit Lea; (3) Starved Rock, Illinois, during the weekend of October 16, 2020; (4) New Buffalo, Michigan, during a weekend in February 2021; (5) Philadelphia, Pennsylvania, for the weekend of June 20, 2021; (6) Eagle, Wisconsin, for the Fourth of July weekend 2021; (7) Starved Rock and Elkhorn, Wisconsin, with Ian during Labor Day Weekend 2021; and (8) the University of Missouri to visit Lea on October 15, 2021.

¶ 165 The various expenses incurred by the parties during such travels are also included in the same stipulations, which showed relatively equivocal expenses borne by both parties. Additionally, although at the time of trial Brent and Melissa did not have concrete travel plans, they intended to visit Brent's family in Texas at the end of 2022 and had also discussed taking an international trip together. However, both Melissa and Brent also testified to taking separate vacations, specifically with their individual friends. Melissa also planned to travel to Missouri on her own for her daughter's college graduation.

¶ 166 On balance, we find that the presence of multiple vacations, which included trips to visit friends and family, as well as the inclusion of Melissa's children, suggests evidence of a *de facto* marriage. However, we agree with the trial court that such evidence is not emblematic that, based on the totality of the circumstances, such a relationship actually exists. See *Edson*, 2023 IL App (1st) 230236, ¶ 173.

¶ 167                    6. *Whether They Spend Holidays Together*

¶ 168    Finally, David contends that the couple has spent birthdays and various holidays together and with family since January of 2018, including Christmas Day, New Year's Day, and Thanksgiving, which also included the exchange of gifts. Melissa responds that the couple has spent "infrequent" holidays together and, when exchanging gifts, such items have been modest and inexpensive.

¶ 169    The trial court did not expressly comment on this factor, but similar to the factor assessing vacations, courts have found that the existence of a *de facto* marriage may be supported by evidence of a couple celebrating holidays and special events together. See *id.* ¶ 182 (evidence of shared holidays and special events relates to the amount and nature of time spent together, and thus may suggest a *de facto* marriage); *Herrin*, 262 Ill. App. 3d at 577 (*de facto* marriage may be found where holidays were spent together); *Toole*, 273 Ill. App. 3d at 612 (exchange of holiday and birthday gifts sufficient to satisfy factor); *Snow*, 322 Ill. App. 3d at 956 (exchange of gifts); *Frasco*, 265 Ill. App. 3d at 177 (exchange of gifts and shared holidays and events); *Walther*, 2018 IL App (3d) 170289, ¶ 32 (all major holidays spent together); *Susan*, 367 Ill. App. 3d at 927, 930 (same).

¶ 170    Here, the record reflects that Melissa and Brent have celebrated their birthdays together since January 2018, as well as some for Melissa's family. They have also celebrated some holidays together, including Valentine's Day, New Year's Eve, Christmas Day, Labor Day, and Fourth of July weekend while on vacation, and one Thanksgiving with Brent's family. However, the record also demonstrates that the two often spend Christmas Day alone together and not with either of their children. The two have also not spent another Thanksgiving together, with Melissa even

testifying that she did not plan to invite Brent to the upcoming one because her children would be present.

¶ 171   With regard to special events, the evidence shows that Melissa has hosted birthday parties for Brent at her home and that his son has attended at least one at her former residence. However, both testified that Brent's son has not seen Melissa since, even though Brent had recently seen him at the time of trial, and no other member of Brent's family has otherwise visited Melissa at either home. Brent also testified that he has not spent Ian's or Lea's birthday with them and has never purchased a birthday present for either, although it was also his testimony that he has bought Christmas gifts for them during the past two years. Additionally, Melissa does not intend to bring Brent with her for Lea's graduation. Finally, although Melissa and Brent have exchanged birthday gifts with each other, they have been relatively nominal in value, ranging from gift cards to a coffeemaker to a pair of concert tickets, although we observe that Brent appears to have spent somewhat more money on Melissa than she on him based on the parties' gift stipulations.

¶ 172   On the one hand, given that the couple has been exclusively together at least since January 2018, one might expect the two to have spent more holidays and special events together within that four-year period. However, as Brent is traveling more for work and is likely only available on weekends, it is reasonable that they would not always be able to do so, and we cannot discount that *some* holidays have been spent together.[9] However, it also appears that the two still view certain holidays as separate, as indicated by the fact that Brent does not spend Christmas Eve with Melissa and her children, as well as Melissa not inviting him to the upcoming Thanksgiving

---

[9]Indeed, as noted by some courts, it would seem that the factors relating to "amount of time spent together," "nature of the relationship," "vacations," and "holidays" could very well be assessed together. See *Miller*, 2015 IL App (2d) 140530, ¶ 49; see also *Edson*, 2023 IL App (1st) 230236, ¶ 182.

holiday or Lea's graduation, despite him previously visiting her at college. This demonstrates an active choice to not be together during certain events or holidays. *Cf. Edson*, 2023 IL App (1st) 230236, ¶ 181.

¶ 173    As such, on balance, although the trial court did not make an explicit finding as to this factor, we find that evaluation of this factor suggests more of an intimate dating relationship than a *de facto* marriage. Although there is evidence of spending some holidays and special events together, there is also an indication that the two still do not view their relationship in such a way where they would be expected to be together at all events, as one might expect in a *de facto* marital relationship.

¶ 174        F. Finding of Intimate Relationship, But Not a *De Facto* Marriage

¶ 175    The trial court's denial of David's petition rested on the fact that, based on the totality of the circumstances, Melissa and Brent's relationship was more akin to an intimate dating relationship, rather than a *de facto* marriage. In this case, although the record shows evidence of a relationship that is monogamous and intimate, it also shows an active choice by both Melissa and Brent to *not* further their relationship in numerous ways, emotionally *and* practically. Thus, we do not find the court's decision to be "unreasonable, arbitrary, or not based on the evidence." *Miller*, 2015 IL App (2d) 140530, ¶ 40. Even assuming this was a closer call, the court's well-reasoned conclusion is still supported by sufficient evidence. See *Lambdin*, 245 Ill. App. 3d at 804 ("Although there was sufficient evidence presented to grant the petition to terminate, there also was sufficient evidence to deny the petition."). As such, we do not find that the trial court's denial of the petition was against the manifest weight of the evidence, and we thus affirm.

¶ 176                III. CONCLUSION

¶ 177   For the reasons stated, we affirm the trial court's denial of David's petition to terminate maintenance payments.

¶ 178   Affirmed.

---

### *In re Marriage of Larsen*, 2023 IL App (1st) 230212

---

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, No. 2017-D-7318; the Hon. Naomi A. Schuster, Judge, presiding. |

---

| | |
|---|---|
| **Attorneys for Appellant:** | Rachel Kolesar, of Fischel Kahn, of Chicago, for appellant. |

---

| | |
|---|---|
| **Attorneys for Appellee:** | Jennifer J. Gibson, of Zukowski, Rogers, Flood & McArdle, of Crystal Lake, for appellee. |